STATE ex rel. UTILITY CONSUMERS COUNCIL of Missouri, Relator-Appellant,

v.

PUBLIC SERVICE COMMISSION of Missouri and Union Electric Company, Defendants-Respondents.

No. 37802.

Missouri Court of Appeals, St. Louis District, Division Two.

Jan. 10, 1978.

Motion for Rehearing and/or Transfer Denied Feb. 14, 1978.

Application to Transfer Denied April 10, 1978.

Samuel H. Liberman, II, David J. Newburger, George S. Newman, Utility Consumers Council of Missouri, Inc., St. Louis, William M. Barvick, Public Counsel, Dept. of Consumer Affairs, Regulation and Licensing, Jefferson City, Jack L. Koehr and Robert C. McNicholas, City of St. Louis, St. Louis, Robert G. Brady and Robert C. Johnson, Bryan, Cave, McPheeters & McRoberts, St. Louis, Bruce S. Feldacher, St. Louis, Robert M. Lindholm, Dept. of Natural Resources, Jefferson City, for relator-appellant.

Michael F. Pfaff, Michael K. McCabe, Jefferson City, Joseph E. Birk and Charles A. Bremer, St. Louis, Gerald Charnoff, Shaw, Pittman, Potts & Trowbridge, Washington, D.C., for defendants-respondents.

PER CURIAM.

Appellant Utility Consumers Council of Missouri, Inc. (hereinafter "UCCM")[1] filed in the circuit court its petition for review of a Report and Order by the Missouri Public Service Commission (hereinafter "Commission") which granted Union Electric Company (hereinafter "Company") a certificate of convenience and necessity pursuant to Sec. 393.170(3), RSMo. 1969.[2] The circuit court upheld the findings and order of the Commission. UCCM appealed to this court. We, too, affirm.

This litigation was initiated on June 7, 1974, when the Company filed its application with the Commission for permission to construct and to operate a nuclear-powered steam electric generating plant in Callaway County, Missouri. Since the plant was to be constructed beyond the regular service territory of the Company, it was necessary for the Company to apply to the Commission for a certificate of convenience and necessity. Sec. 393.170. Appellant UCCM

---

1. UCCM is a non-for-profit corporation organized under the laws of the State of Missouri.

2. All statutory citations refer to the Revised Statutes of Missouri, 1969, unless otherwise indicated.

intervened in the proceedings before the Commission, as did several industries,[3] the City of St. Louis and the Coalition for the Environment. The Office of the Public Counsel entered its appearance.[4]

The Company's plans called for the construction of two nuclear-powered generating units, each with a nominal electrical output capacity of 1,150 megawatts. The basis of each unit was to be a pressurized water reactor (PWR) modeled on the Standardized Nuclear Unit Power Plant System (SNUPPS) developed by a consortium of five utilities.[5] The nuclear steam supply system (NSSS) would include four steam generators along with the nuclear reactor to convert water to steam using reactor heat. The fuel in the reactor core would be in the form of small uranium dioxide pellets. The heat generated in the reactor would be transmitted to the steam generators where the steam produced would drive the turbine-generators to produce electricity. The operation of the first unit was planned for 1981, and the operation of the second unit for 1983.

Public hearings held primarily in Jefferson City, Missouri with one session in Clayton, Missouri lasted nearly one month. The industrial intervenors filed a "Statement of Position", but they did not participate in cross-examination at the hearings. The Coalition for the Environment filed nothing

after their "application to intervene" but were represented at the hearing by the same counsel appearing for appellant UCCM. Counsel for the City of St. Louis, the Public Counsel, the counsel for appellant, and counsel for the Company participated in cross-examination at the hearings.

On March 14, 1975, the Commission entered its "Report and Order", to become effective April 1, 1975, finding in pertinent part that:

1) "the need for the proposed plant to meet present and future demands for service was established by Company";

2) "based on all of the evidence in the record, we [the Commission] are compelled to reach the conclusion that the most economical way of supplying the increased electrical needs of Company's customers in the future is through the construction of the proposed nuclear plant";

3) "the evidence in this record clearly establishes within reasonable certainty, Company's ability to obtain the necessary financing";

4) "the issue of radiological health and safety is within the exclusive jurisdiction of the federal government";

5) "there remains no specific statutory authority for *in camera* proceedings"; and

---

3. General Motors Corporation, McDonnell Douglas Corporation, Monsanto Company, PPG Industries, Inc. and Anheuser-Busch, Inc.

4. The Office of the Public Counsel was created by the Omnibus State Reorganization Act, Laws 1974, 1st Ex.Sess., p. 530, S.B. No. 1, which appears in the statutes as Appendix B, preceding Chapter 26, RSMo. (Supp.1975). See also, Sec. 386.070 V.A.M.S. (1977 pocket part). The Office of the Public Counsel is a segment of the Department of Consumer Affairs, Regulation and Licensing. Sec. 1.5(1); Sec. 4.

The Omnibus State Reorganization Act effectively transferred from the Commission's general counsel to the public counsel the duty to represent the public interest before the Commission. In *State ex rel. Mo. Power & Light Co. v. Riley,* 546 S.W.2d 792, 796[4] (Mo.App. 1977), the court stated:

". . . it was clearly the intent of the legislature in the creation of the office of

Public Counsel to divorce his functions from those of the General Counsel for the Commission; to place them in adversary positions where the facts of a situation warranted; to impose upon the Public Counsel the duty to represent the interests of the public and as a concomitant thereof clothe him with the power to adequately represent them; and, thus to achieve a fair balance of rights as between the public interest on the one hand and private interests on the other."

The Public Counsel herein actively participated in the hearings in his adversary role. He neither appealed nor joined in this appeal, although the court determined in *State ex rel. Mo. Power & Light Co. v. Riley, supra,* that the Public Counsel had the right to judicial review.

5. Union Electric Company, Rochester Gas and Electric, Northern States Power, Kansas Gas and Electric, and Kansas City Power and Light Company.

6) "with regard to the proprietary privilege claimed by Company, this Commission does not have the jurisdiction or authority to determine judicial questions."

The Commission also found that the construction of the nuclear plant was in the public interest. On March 31, 1975 appellant filed its "Motion to Set Aside Final Order and Re-Hear Case" which was denied.

On May 1, 1975, appellant filed its "Petition for Writ of Certiorari, Writ of Review" pursuant to Sec. 386.510, RSMo. (1975 Supp.). On September 19, 1975, appellant filed a "Motion to Summarily Set Aside Commission's Order and Remand the Matter to the Commission for Further Proceedings" for the reason that appellant had discovered that written testimony allegedly submitted to the Commission on the subject of safety was not filed in the record. On January 7, 1976, the Circuit Court affirmed the Commission's Report and Order. Thereafter, appellant filed its timely notice of appeal.

■ Initially, this court notes that jurisdiction is properly vested in the St. Louis District. Section 386.510, RSMo. (1975 Supp.) states that "the applicant [for review] may apply to the circuit court of the county where the hearing was held or in which the commission has its principal office for a writ of certiorari or review." Because a formal public hearing was held by the Commission in St. Louis County (Clayton), Missouri, the applicant's petition for review was properly brought in the circuit court of St. Louis County. See, *State ex rel. Case v. Seehorn,* 283 Mo. 508, 223 S.W. 664, 670–71[8] (banc 1920). Thus, this appeal lies within our territorial jurisdiction.

■ Briefly, the scope of review for both the circuit court and this court is delineated by Sec. 386.510, RSMo. (1975 Supp.). This section provides for judicial review of administrative action to determine the "reasonableness or lawfulness" of the action. An administrative order is lawful if the Commission had statutory authority to issue it.[6] The order is reasonable if it is supported by competent and substantial evidence on the whole record. *State ex rel. Ozark Electric Coop. v. Public Service Com'n,* 527 S.W.2d 390, 392[1] (Mo.App. 1975) and cases cited therein. See also Mo. Const. Art. V § 22. The term "substantial evidence" means competent evidence which, if believed, would have a probative force on the issues. *State ex rel Rice v. Public Service Commission,* 359 Mo. 109, 220 S.W.2d 61, 64[3] (banc 1949); *Brooks v. General Motors Assembly Division,* 527 S.W.2d 50, 53[4] (Mo.App.1975). Appellant has the responsibility of pointing out the evidence which it considers unreasonable and unlawful. *State ex rel. Pugh v. Public Service Commission,* 321 Mo. 297, 10 S.W.2d 946, 952[10] (1920).[7]

I

■ We believe that appellant's most significant point for reversal is:

"The Commission's refusal to permit Appellant to cross-examine Company's witnesses on the basis of their conclusions regarding comparative costs of nuclear and fossil plants and Mr. Cornelius' testimony regarding the impact of the proposed construction on future revenue

---

6. Appellant does not challenge the authority of the Commission to enter its order issuing the certificate of convenience and necessity to the Company.

7. Appellant has alleged that "crucial evidence", specifically Exhibit 18 and the testimony of W. E. Cornelius regarding rate increases, is incompetent. Appellant contends that evidence by Donald Schnell on fuel costs is incompetent. There are other areas in which appellant claims that the denial of cross-examination rendered "the evidence" incompetent, but it does not specify which evidence. Additionally, appellant contends that the entire testimony of H. Clyde Allen should be "disregarded" as incompetent. In its Reply Brief appellant goes so far as to state that "all of the evidence in the record" is insufficient to support the Commission's findings. The bulk of appellant's claims that evidence is incompetent lacks the requisite specificity to carry appellant's burden of pointing out the evidence which it considers unreasonable and unlawful.

needs and rate increases renders that evidence insubstantial and incompetent. Testimony that has not been cross-examined is incompetent and insubstantial since its veracity has never been tested and thus cannot be trusted. Without the support of this testimony the evidence upon which the Commission's decision is based is insubstantial and incompetent. Thus the PSC's Order is not based upon substantial and competent evidence upon the whole record and must be set aside."

Appellant contends that it was denied cross-examination as to the contract price of the turbines, the escalator factors in the turbine contracts, the "base-line" price of Company contracts with Bechtel Power Corp., Westinghouse Corp. and General Electric Corp., the cost of uranium and the cost of fabricating the fuel assemblies that hold the uranium pellets. Appellant alleges for the first time in its brief that this contract

information was necessary to determine the extent to which the Company's principal exhibit, Exhibit 18,[8] was based on firm contracts or on estimates.[9] The Company claimed at the hearings and on appeal that the information sought by appellant was proprietary.[10]

The right to cross-examination in administrative proceedings is governed by Sec. 536.070(2),[11] which provides that:

"Each party shall have the right to call and examine witnesses, to introduce exhibits, to *cross-examine opposing witnesses on any matter relevant to the issues even though that matter was not the subject of the direct examination,* to impeach any witness regardless of which party first called him to testify, and to rebut the evidence against him." (Emphasis added).

The hearings of administrative agencies must be conducted consistently with funda-

---

8. Exhibit 18, a document entitled "1982 Annual Cost Comparison", was a chart comparing the 1982 costs of a nuclear facility of 1,150 megawatts with the 1982 costs of two coal units each producing 575 megawatts. The exhibit falls within the ambit of *Willapoint Oysters v. Ewing,* 174 F.2d 676, 691[18, 19] (9th Cir. 1949) wherein the court reaffirmed the evidentiary rule that "where voluminous documents are a necessary part of the evidence in a cause, it is well settled that tabulations of these documents in the forms of charts and schedules may be introduced for the aid of the trier of fact."

9. It should be noted that, during the hearings, appellant did not present this reasoning and did not approach the lack of cross-examination on contract terms so vigorously. On two occasions, counsel for appellant indicated his uncertainty that he would cross-examine on the contracts or on Exhibit 18. His primary concern was whether the Company was "overly optimistic" on its numbers (data).

10. The Company contends that proprietary means that contract terms are protected from disclosure to non-contracting parties. Disclosure is a breach of contract for Company. A proprietary clause in a contract exists to prevent collusion by vendors in accordance with antitrust laws. The proprietary clause, Paragraph "b" of Article 17 of Company's fuel contract, reads as follows: "Westinghouse also has a proprietary interest in the proposal—referring to the proposal to sell fuel—and in this contract or other documents resulting therefrom, the aforementioned proposal and con-

tract documents of any contract resulting therefrom shall not be disclosed in whole or in part to third parties without the prior written consent of Westinghouse; provided, however, that nothing in this proprietary data clause shall be construed to deprive the owner from enforcing any rights granted by the terms and conditions of any contract resulting from the proposal."

11. Chapter 536, the Missouri Administrative Procedure Act, supplements Chapter 386 regulating the Public Service Commission, except where in direct conflict with it. See *Patterson v. Thompson,* 277 S.W.2d 314, 317[5] (Mo.App. 1955). Thus, the procedures delineated in Chapter 536 for a hearing and for the presentation of evidence during a hearing apply unless a contrary provision exists in Chapter 386.

Although Sec. 386.410 states that "[a]ll hearings before the commission or a commissioner shall be governed by rules to be adopted and prescribed by the commission" these rules were not introduced into evidence. This court can not take judicial notice of the Commission's rules. *Nabors v. United Realty Company,* 298 S.W.2d 474, 480[6] (Mo.App.1957); *Kersey v. Harbin,* 531 S.W.2d 76, 80[7] (Mo. App.1975). The provisions of Sec. 536.031(5), RSMo. (1976 Supp.), providing for judicial notice of the Code of State Regulations which publishes agency rules, did not take effect until January 1, 1976. The proceedings giving rise to this appeal occurred in 1974, prior to that effective date. For the current rules, see 4 CSR 240–2.130.

mental principles of due process which include the right of cross-examination. *Southern Stevedoring Co. v. Voris,* 190 F.2d 275, 277[2] (5th Cir. 1951). The purpose of cross-examination is to sift, modify or explain what has been said, to develop new or old facts in a view favorable to the examiner, *Hungate v. Hudson,* 353 Mo. 944, 185 S.W.2d 646, 649[6] (1945), and to test the correctness of the information from the witness with an eye to discrediting the accuracy or truthfulness of the witness. *Lolordo v. Lacy,* 337 Mo. 1097, 88 S.W.2d 353, 355[3] (1935). When the evidence is critical to the issues and necessary to sustain a proponent's burden of proof, cross-examination is essential to testing the reliability of evidence. As the court stated in *Powhatan Mining Co. v. Ickes,* 118 F.2d 105, 109 (6th Cir. 1941), in a situation where an agency had compiled data from coal purchasers but refused to disclose the names of the producers:

> "It is difficult to see how the accuracy, authenticity and relevancy of these tabulations could be tested in any way without the disclosure of the names of the code members [coal producers] who reported the data upon which the tabulations are based."

In reversing, the court noted that, absent cross-examination to obtain these names and other relevant information, errors could not be checked nor the real meaning of figures developed.

Likewise, in *Re Investigation of Minimum Highway Permit Carriers,* 72 PUR 3d 237 (Cal.Pub.Util.Com'n 1968), the Commission found that cross-examination to obtain the revenues, tonnages and products of carriers (though not their names) should have been allowed. And, the Commission commented at 243 that "parties to commission proceedings are entitled to sufficient information on the record to test the accuracy of the facts and conclusions set forth in the staff reports."

 We conclude that the appellant's right to cross-examination was improperly restricted. The Company contends that the proprietary nature of the information sought by appellant's cross-examination protected that information from disclosure.[12] This contention cannot stand. The Company did not present any law at the hearings nor to this Court which would indicate that there was an evidentiary privilege because of the proprietary nature of the contracts. We do find cases which recognize the proprietary interest and we are not unmindful of the problem. See, *Westinghouse Elec. Corp. v. United States Nuclear Regulatory Com'n,* 555 F.2d 82 (3rd Cir. 1977). Though the court acknowledges that in some circumstances the proprietary nature of information may shelter it from examination, the Company here cannot hide behind the proprietary nature of the information. The Company proffered testimony and exhibits based on proprietary information. If it seeks to rely on proprietary information to carry its burden of proof and, thereby, benefit from the use of such information, then it may not protect that information from scrutiny by claiming it need not disclose. Furthermore, when the subject matter under consideration is of such importance to the public welfare, we believe that the public interest requires full disclosure of relevant information on cross-examination. See *Westinghouse Elec. Corp. v. United States Nuclear Regulatory Com'n, supra* at 92.[13]

---

12. Though the court need not decide this issue, it notes that the right to inspect the proprietary information was offered to all parties upon the signing of a nondisclosure agreement. This opportunity was rejected by appellant and all others. Furthermore, the Commission suggested that appellant subpoena the contracts for its perusal. Appellant had the right to utilize subpoena power of the agency, Sec. 536.077, but failed to take advantage of it.

13. The Nuclear Regulatory Commission has a rule providing for disclosure of proprietary information. We believe that the Commission should take steps to promulgate a similar rule for the examination of proprietary information and for the presentation of evidence or cross-examination involving proprietary data by means of an *in camera* proceeding. *In camera* examination is allowed in other situations. See, e. g., Sec. 452.385, RSMo. (1975 Supp.) providing for examination of a child in cham-

We must next determine the effect of the improper restriction of cross-examination. Appellant contends that all evidence on the comparative costs of a nuclear-powered plant versus a coal-fired plant was rendered incompetent by the Commission's improper restriction. However, appellant was given the opportunity and did examine extensively information provided in Exhibit 18. At the close of the hearings, the Commission asked all parties individually, including the appellant, if they had any objection to the admission of the exhibits, specifically referring to the numbers of the exhibits. Appellant replied "no objection" to the admission of all exhibits, including Exhibit 18. All exhibits were admitted.

■■■ Failure to object to the admission of Exhibit 18 after appellant had been restricted in its cross-examination constituted a waiver by appellant, and it cannot now object to its admission. Even if an objection or a motion to strike had been made, the entire exhibit would not have been inadmissible. The principle is well-established that, if any part of an exhibit is admissible, an objection going to the whole of it is properly overruled. *Breshears v. Union Electric Company*, 373 S.W.2d 948, 952[2] (Mo. banc 1964); *Allen v. St. Louis Public Service Company*, 365 Mo. 677, 285 S.W.2d 663, 667–8[8] (1956). Oral testimony by various witnesses regarding cost comparisons which appellant claims the Commission should not consider falls into a cate-

gory of evidence wherein the testimony was admissible when taken and only later, due to the restriction of cross-examination, became inadmissible. Appellant made no motion to strike either at the time when its cross-examination was restricted or at any other time. It is well-settled that a motion to strike is the correct means of removing from consideration evidence properly admitted when such evidence later becomes inadmissible. *Michaud v. Ruch*, 545 S.W.2d 703, 707 (Mo.App.1976); *Davis v. Sedalia Yellow Cab Company*, 280 S.W.2d 869, 871[4] (Mo. App.1955); *Weniger v. Weniger*, 32 S.W.2d 775, 776[4] (Mo.App.1930). Failure to make a motion to strike constituted a waiver by appellant, so that oral testimony which could have been excluded was nevertheless properly considered by the Commission.

■■■ Appellant further contends that its cross-examination of Mr. W. E. Cornelius, Executive Vice-President of the Company, was restricted. The Company presented evidence regarding the financing of construction through Mr. Cornelius. The cost of construction for the nuclear facility was projected at $1,758,000,000. This cost would be financed by issues of all types of securities and by tapping internal sources of funds. Mr. Cornelius testified that these resources would provide the financial capability to finance construction. Mr. Cornelius was cross-examined regarding the necessity or probability of a rate increase due to the cost of construction.[14] Appellant in-

bers; *Re Pacific Northwest Bell Tel. Co.* 9 PUR 4th 49, 55 (Oreg.Pub.Serv.Com'n 1975) wherein inspection of documents containing trade secrets proceeded *in camera;* and *State v. Yates,* 442 S.W.2d 21, 25[5] (Mo.1969) wherein the court stated that the public interest in effective law enforcement demanded an *in camera* proceeding to discover the name of an informant and yet to preserve his confidentiality. The Commission's *in camera* sessions could be placed on the record and all parties and counsel would be present. Testimony at such sessions would only be transcribed and revealed in the event that the Commission relied on the testimony in its findings.

Appellant attacks the denial of an *in camera* proceeding in the instant case. However, it failed to raise the issue in its "Motion to Set Aside Final Order and Re-Hear Case" and, thus, has not preserved the issue for review.

Sec. 386.500(2). Even if appellant had properly preserved its point, it would not be necessary to determine the issue because we concede its primary point. Appellant contends error in denial of an *in camera* proceeding only because it was improperly denied cross-examination on certain subjects. We agree that its cross-examination was improperly restricted, so we need not address the secondary, or alternative point regarding the *in camera* proceeding.

14. Appellant argues to this court that a material aspect of the case is whether the financing of construction would necessitate a rate increase and, thereby, reduce demand for electricity. Appellant assumes that if rates are increased, demand is reduced; and, if demand is reduced, the need for the proposed facility is eliminated. No evidence to this effect was introduced. In fact, testimony revealed that the demand for

quired about the specific amounts and the timing of future rate increases and the projected net operating income of the Company. The Company objected on the ground that public disclosure of the figures was prevented by the Securities Act of 1933, 15 U.S.C.A. § 77e(c), since the Company had registered an issuance of securities with the Securities and Exchange Commission. The objection was sustained. As with the proprietary information, the Commission erred in sustaining this objection. Appellant failed to make an offer of proof and even stated that "we aren't going through objections." Further, appellant failed to make a motion to strike any evidence relating to financial data and failed to object to the admission of Exhibit 6. In addition, the financial information was later revealed by a different series of questions using averages rather than specific figures as requested, so that appellant actually obtained the information sought by cross-examination though in a different manner. Furthermore, net income was available to appellant in Company Exhibit 6. The method of computing net operating income was explained to appellant, as was the possibility that a rate increase might be necessary if net operating income dropped.

Appellant elected not to cross-examine Mr. Ernest G. Ellingson, Chief of Economic Research for the Commission, on matters pertaining to proprietary information; however, appellant did cross-examine Mr. Ellingson on other matters. Appellant contends that this decision did not constitute a waiver of its right to cross-examination in view of its "continuing objection" regarding the denial of cross-examination on proprietary data. And, appellant argues that any of Mr. Ellingson's testimony based on the proprietary information is incompetent. Mr. Ellingson signed a nondisclosure agreement and was then able to examine the so-called proprietary contracts. He testified that the contract terms for the purchase of uranium were excellent and could not be duplicated in the current market. Renegotiation of the fuel contracts would add $50–100 million to the cost of the contracts. Mr. Ellingson also examined the cost calculations of the Company, assuming facts based on his own independent, objective experience and more stringent than those used by the Company. He concluded that the cost would be lower for a nuclear plant than for a coal-fired plant. The appellant did not attempt to cross-examine Ellingson on information he obtained as a result of his examination of the contracts. Appellant made no motion to strike any of Mr. Ellingson's testimony, and it remained available for the Commission's consideration.

We find there was further competent and substantial evidence on the whole record to support the findings of the Commission,[15] which includes the testimony of witnesses presented to support Company's contention that nuclear power was less costly than coal power. The principal witness was Mr. H. Clyde Allen, Director of Corporate Planning for the Company. He prepared Company Exhibit 18, and concluded that under all conditions the cost advantage rested with the nuclear facility. Mr. Allen was extensively cross-examined regarding the mathematical computation used to arrive at the cost per kilowatt hour for each facility, the background data on which Exhibit 18 was based, the cost of capital, the effects of inflation on fuel (coal) costs, the cost of construction obtained from the engineering department of the Company, and the capacity factor at which a nuclear plant must operate to be as expensive as a coal plant. Estimates of costs by the Bechtel Power Corp., designer of the proposed nuclear facility, were confirmed by the experience of other SNUPPS members, Rochester Gas and Electric as well as Northern States Power, who had already built nuclear power plants. Studies by another recognized consultant in the field of nuclear power, Ar-

---

electricity is price inelastic; i. e., a rate increase does not result in a decrease in demand.

15. Even had this court excluded Exhibit 18 from consideration, there remains other exhibits and testimony of several witnesses to support the Commission's findings.

thur D. Little Co., also confirmed the Company's cost calculations.[16]

His testimony revealed that the use of scrubbers, equipment which removes sulfur dioxide from coal, had not been calculated in the cost per kilowatt hour for coal units. That calculation would reduce capacity of the coal plant by five and one-half percent (5½%) and, accordingly, increase the cost.

Mr. Donald F. Schnell, Company Manager for Nuclear Engineering, explained that over its life the nuclear plant would produce savings over a coal-fired plant because the maintenance and operating expenses are higher for a coal-fired plant than for a nuclear plant, and reliability of operation is lower for a coal-fired unit. He also described generally the contracts the Company had entered for the construction and operation of the facility other than the design and consultant arrangement with Bechtel Power Corp. Westinghouse Electric Company contracted to construct the nuclear steam supply system and to supply fuel. The fuel would be enriched by the Atomic Energy Commission pursuant to a thirty-year contract. General Electric Corporation contracted to provide the turbine generators.

Mr. Charles J. Dougherty, President of the Company, added that the total cost of a nuclear plant, including capital costs, taxes, maintenance, operating expenses and depreciation, was lower than the total costs for a fossil fuel plant due to lower annual fuel costs. He testified that the nuclear generating facility was the most attractive source of electricity from an economic and environmental standpoint.

Other in-depth evidence was presented by Staff witness Dr. Walter Meyer, Professor and Chairman of Nuclear Engineering at the University of Missouri.[17] Dr. Meyer provided tabulations which compared costs of electrical power derived from various energy sources. All five of his tabulations, compiled from data pertaining to other nuclear facilities, revealed that nuclear power systems produce electricity at a lower cost than fossil fuel systems. Dr. Meyer concluded that the Company had made an objective evaluation in electing nuclear generating power.

## II

■ Appellant also contends that the circuit court erred in failing to remand the case to the Commission for further testimony in light of new evidence discovered by appellant. Appellant claims that the written testimony of Dr. David Hoeppner, faculty member of the Nuclear Engineering Department at the University of Missouri, could have been filed with the Commission but was not filed. Furthermore, Dr. Hoeppner was not called to testify at the Commission hearing. But, appellant alleges that the testimony was considered and rejected by the Commission.

The Circuit Court may remand for further testimony only when the Commission failed to accept evidence "properly proffered" during Commission proceedings. Sec. 386.510, RSMo. (1975 Supp.). The record is devoid of any showing that the proposed testimony of Dr. Hoeppner was offered, either properly or improperly, at the Commission hearings. Nor is there any indication in the record that the Commission knew of, read, considered, relied on or rejected the proposed testimony of Dr. Hoeppner. Our examination of Dr. Hoeppner's short statement, filed with the Circuit Court and made a part of its record, shows that his testimony is merely cumulative and would not affect the findings of the Commission.

Appellant had also requested the Circuit Court to hold a hearing on the "newly dis-

16. Exhibit 26, "A Study of Base Load Alternatives for the Northeast Utilities System" revealed that total generation costs in mills per kilowatt hour were lower for a nuclear unit than for a coal unit. Likewise, the operation and maintenance costs were lower for the nuclear plant than for the coal plant. Exhibit 27, "Report to Long Island Lighting Co. on Base Load Alternatives, for the 1981–1984 Period" provided nearly identical conclusions.

17. Pursuant to contract, the Nuclear Engineering Staff of the University of Missouri was hired as consultants to the Commission to provide expertise in nuclear matters.

covered" evidence of Dr. Hoeppner's testimony. The statute, Sec. 386.510, RSMo. (1975 Supp.) is clear in stating that "no new or additional evidence may be introduced upon the hearing in the circuit court". We believe the sentiments expressed in *Interstate Commerce Com'n v. Jersey City*, 322 U.S. 503 at 514, 64 S.Ct. 1129 at 1134[5] 88 L.Ed. 1420 at 1428 (1944) are apropos:

"One of the grounds of resistance to administrative orders throughout federal experience with the administrative process has been the claims of private litigants to be entitled to rehearings to bring the record up to date and meanwhile to stall the enforcement of the administrative order. * * * If upon the coming down of the order litigants might demand rehearings as a matter of law because some new circumstance has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening."

The circuit court correctly refused to remand or to hear new evidence.

### III

■ Appellant contends that the circuit court erred in failing to remand to the Commission for further testimony regarding the economic impact of nuclear accidents on the overall cost of a nuclear power plant. A thorough reading of nearly 4,600 pages of transcript and 107 exhibits reveals that the Commission admitted into evidence a bulk of information relating to the question of safety. The Findings of Fact and Conclusions of Law issued by the Commission indicate that the Commission did, indeed, evaluate the evidence on safety. The evidence indicated that the economic impact of the risk of a possible nuclear accident was insignificant. And, appellant admitted that any prediction of the cost of a possible nuclear accident was purely speculative, and the testimony showed that no data

existed to predict such a cost. The safety of the production and use of nuclear energy is one of the great debates of our time. However, neither the Commission nor this court, in reviewing this case, has the authority to determine that the construction of a nuclear generating facility in Callaway County is safe. The federal government preempts this issue.

■ The doctrine of federal preemption with respect to the safety issue is aptly expressed in the leading case *Northern States Power Co. v. State of Minnesota*, 447 F.2d 1143 (8th Cir. 1971), aff'd mem., 405 U.S. 1035, 92 S.Ct. 1307, 31 L.Ed.2d 576 (1972), written by Judge Matthes who was formerly of this court. The court there held that the federal government has exclusive authority to regulate the construction and operation of nuclear power plants. The holding is compatible with the relevant federal statutory provision, 42 U.S.C.A. § 2021(k), reserving to the States the regulation of "activities for purposes other than protection against radiation hazards." The basis for the ruling in *Northern States Power Co.* was that the control of radioactive effluents discharged from the power plant was closely intertwined with the planning, construction and operation of the nuclear facility. Herein lies the distinction in the present case. The federal government regulates *how* nuclear power plants will be constructed and maintained; the State of Missouri regulates *whether* they will be constructed.[18] The federal regulations pertain to plans, specifications, safety mechanisms and the like. The Commission's considerations pertain to economic feasibility, need for increased power and financing. It is obvious that the considerations of the State of Missouri do not affect the control of *how* the nuclear facility will be constructed and physically maintained. The considerations of the Commission do not attempt to protect the citizens of Missouri against radiation hazards. The issue of

---

18. The Commission must determine whether it will issue its certificate of convenience and necessity. To arrive at its determination, the Commission must find that the nuclear facility is adequate to meet the needs of the public and is economical when compared with alternative sources of energy.

safety rests in the exclusive domain of the federal government. We find no error in the refusal of the circuit court to remand for further evidence regarding the economic impact of nuclear accidents on the overall cost of the nuclear power plant.

Finding that the order of the Commission granting a certificate of necessity and convenience to the Company was supported by competent and substantial evidence on the whole record, we affirm.

All the Judges concur.