

# In the Missouri Court of Appeals
# Eastern District
## DIVISION THREE

| | | |
|---|---|---|
| MISSOURI LANDOWNERS ALLIANCE, et al., | ) ) ) | No. ED107886 |
| Appellants, | ) ) ) | Appeal from the Missouri Public Service Commission |
| vs. | ) ) | EA-2016-0358 |
| PUBLIC SERVICE COMMISSION, et al., | ) ) ) | |
| Respondents. | ) | FILED: December 17, 2019 |

<u>OPINION</u>

Missouri Landowners Alliance ("MLA") and Eastern Missouri Landowners Alliance, d/b/a Show Me Concerned Landowners, Christina Reichert, and Missouri Farm Bureau (collectively "Farm Bureau") appeal the report and order issued by the Public Service Commission of the State of Missouri ("Commission") on remand granting Grain Belt Express Clean Line, LLC ("Grain Belt") its application for a certificate of convenience and necessity ("CCN") to construct and maintain an interstate electrical line and associated facilities. We affirm.[1]

---

[1] The Commission's motion to strike portions of MLA's brief and appendix is denied as moot.

Procedural Background

The procedural history surrounding this consolidated appeal is complicated and involves multiple parties and intervenors.[2]

Relevant to this appeal, Appellant MLA was an intervenor in the matter before the Commission as were Appellants Eastern Missouri Landowners Alliance, d/b/a Show Me Concerned Landowners, Christina Reichert, and Missouri Farm Bureau (collectively "Farm Bureau"). Additional intervenors were Respondents Missouri Joint Municipal Electric Utility Commission ("MJMEUC") and Renew Missouri. Respondent MJMEUC is a joint action agency and a public and corporate body of the State of Missouri authorized by legislation to construct, operate, and maintain transmission and generation facilities for the production and transmission of electric power for its members, purchase and sell electric power and energy, and enter into agreements with any person for the transmission of electric power. MJMEUC has 68 Missouri municipal members, and Citizens Electric Corporation, a rural electric cooperative with more than 21,000 members, is an advisory member. Together, MJMEUC's members serve approximately 347,000 Missouri retail electric customers.

Again, relevant to this appeal, Respondent Commission is the state agency responsible for the regulation of public utilities in Missouri and whose authority extends to the issuance of CCNs for the construction of electric plants within Missouri.

Respondent Grain Belt is the limited liability company that applied for a CCN to construct and maintain an interstate electrical line and related facilities.

Respondent Renew Missouri is a non-profit group focused on renewable energy and energy efficiency policy that submitted several filings in support of Grain Belt's application.

---

[2] In all, there were over twenty parties to whom the Commission granted intervention.

2

Factual Background

On August 30, 2016, Grain Belt filed an application with the Commission for authorization to build the Missouri portion of an electric transmission line which would run approximately 780 miles and which would move wind-generated energy from western Kansas to Missouri and other states farther east. Grain Belt filed its application pursuant to Section 393.170.1, RSMo (2016),[3] 4 CSR 240-2.060, and 4 CSR 240-3.105(1)(B).

The proposed route of the line would cross 206 miles through eight northern Missouri counties: Buchanan, Caldwell, Carroll, Chariton, Clinton, Monroe, Randolph, and Ralls. The transmission line would cross the property of approximately 570 Missouri landowners and would deliver 4,000 megawatts of wind-generated electricity from western Kansas, including 500 megawatts to Missouri and 3,500 megawatts to states further east. Grain Belt also proposed to construct the Missouri converter station and associated AC interconnecting facilities in Ralls County.

The Commission conducted local public hearings in each of the eight counties where the proposed transmission line would be located. From March 20 through March 24, 2017, the Commission held an evidentiary hearing and issued its decision on August 16, 2017, rejecting Grain Belt's application for a CCN on procedural grounds.[4]

Grain Belt appealed the Commission's decision to this Court, which reversed and then transferred the case to the Missouri Supreme Court. On transfer, the Missouri Supreme Court concluded that the Commission had erred in finding it could not lawfully grant a CCN to

---

[3] Unless otherwise indicated, all further statutory references are to RSMo (2016), as amended.
[4] The decision was essentially based on the ground that Grain Belt had not secured the consents pursuant to Section 229.100 from all of the County Commissions in the eight counties where the line would be built, a requirement imposed by a case from the Western District of the Court of Appeals in an unrelated case. In re Ameren Transmission Co. of Illinois (ATXI), 523 S.W.3d 21 (Mo. App. W.D. 2017).

Grain Belt and remanded back to the Commission to determine whether Grain Belt's "proposed utility project is necessary or convenient for the public service."[5] Grain Belt Express Clean Line, LLC v. Public Service Comm'n, 555 S.W.3d 469, 474 (Mo. banc 2018).

On remand, the Commission held another evidentiary hearing on December 18-19, 2018. The Commission received additional evidence regarding potential changes which may have occurred since the issuance of its Report and Order on August 16, 2017.

On March 20, 2019 (effective April 19, 2019), the Commission issued its Report and Order granting Grain Belt a certificate of convenience and necessity, subject to conditions, and thereby approving Grain Belt's application to build the Missouri portion of the proposed transmission line.

In granting the CCN, the Commission considered whether the Grain Belt proposal was "necessary or convenient for the public service" under the five "Tartan factors."[6] The factors considered are: a) there must be a need for the service; b) the applicant must be qualified to provide the proposed service; c) the applicant must have the financial ability to provide the service; d) the applicant's proposal must be economically feasible; and e) the service must promote the public interest.

Under the first Tartan factor, the Commission found that Grain Belt was devoting its transmission line and converter station to a public use and that there was need for the Grain Belt project. The Commission found that Grain Belt would benefit MJMEUC and the Missouri

---

[5] In finding that prior consent from would-be affected counties is required for a utility to obtain an "area" CCN, the Missouri Supreme Court held that such consent is not required for a "line" CCN, thereby abrogating In re Ameren Transmission Co. of Illinois, 523 S.W.3d 21.
[6] In re Tartan, GA-94-127, 1994 WL 762882 (Mo.P.S.C. Sept. 16, 1994).

4

Public Energy Pool[7] ("MoPEP"), as well other Missouri cities that have contracted to purchase wind energy from Kansas over the Grain Belt transmission line.

Under the second and third Tartan factors, the Commission found that Grain Belt established its qualifications and financial ability to support the Grain Belt project.

Under the fourth Tartan factor, regarding economic feasibility, the Commission found that the Grain Belt project is an interregional transmission line that would lead to lower transmission congestion costs for utilities, and reduce the cost to utilities of serving their load. Higher wind speeds in Kansas, together with tax incentives, and lower construction costs allow Kansas to generate wind energy at a lower cost compared to wind energy generated in the east. Compared to other forms of alternative energy the total delivered cost of energy from Grain Belt is less than other renewable or conventional energy alternatives. Finally, the Commission found that the size of the Grain Belt Project would achieve an economy of scale that is significantly less expensive than a project that served Missouri alone.

Under the fifth Tartan factor, regarding public interest, the Commission found that Grain Belt's final proposed route "represents the best route to minimize the overall effect of the Project on the natural and human environment while avoiding unreasonable and circuitous routes, unreasonable costs, and special design requirements." Additionally, the Commission found that the project would lower Missouri's adjusted energy production costs, provide benefits to Missouri's environmental and public health, through the generation of no emissions wind energy, and would have a "substantial and favorable effect on the reliability of electric service in Missouri." The Commission found that the economic impact of the Grain Belt project would be dramatic, both in terms of job creation as well as state revenue.

---

[7] MoPEP is a group of 35 Missouri cities for which MJMEUC provides full requirements for wholesale energy, capacity, and ancillary services.

5

Finally, the Commission found that Grain Belt qualified as an electrical corporation for purposes of Sections 386.020 (14), (15) and Section 393.170. The Commission found that Grain Belt had acquired 39 easements for the transmission line from Missouri landowners, which gave Grain Belt the right to construct, operate, repair, maintain, and remove an overhead transmission line and related facilities, along with rights of access to the right-of-way for the transmission line. The Commission also found that Grain Belt had cash on hand to be used for project development.

Based on these findings, the Commission determined that the Grain Belt project would benefit Missouri citizens and serve the public interest. Thereafter, the Commission unanimously granted Grain Belt the CCN for which it had applied on August 30, 2016.

MLA and Farm Bureau timely filed applications for rehearing with the Commission. The Commission denied the applications for rehearing. MLA and Farm Bureau now appeal.[8]

Standard of Review

Pursuant to Section 386.510, our review of the Commission's final report and order "is two-pronged: 'first, the reviewing court must determine whether the [Commission's] order is lawful; and second, the court must determine whether the order is reasonable.'" Grain Belt Express Clean Line, LLC v. Public Serv. Comm'n, 555 S.W.3d 469, 471 (Mo. banc 2018). "The Commission's order is presumed valid, and the burden of showing the order is unlawful or unreasonable rests with the appellant." Grain Belt Express Clean Line, LLC, 555 S.W.3d at 471. This procedure "for judicial review in section 386.510 is exclusive and jurisdictional." State ex rel. AG Processing, Inc. v. Pub. Serv. Comm'n, 120 S.W.3d 732, 735 (Mo. banc 2003).

The first prong is the "lawfulness of a [Commission] order." State ex rel. AG Processing, Inc., 120 S.W.3d at 734. An order is lawful if the Commission acted within its statutory

---

[8] Additional facts will be included, as necessary, in the discussion section below.

6

authority.  Id.  If the reviewing court finds the Commission's order to be unlawful, the order is overturned and the reviewing court "need not reach the issue of the reasonableness of the [Commission's] order."  Verified Application & Petition of Liberty Energy (Midstates) Corp. v. Office of Public Counsel, 464 S.W. 3d 520, 524 (Mo. banc 2015).

However, if the Commission's order is determined to be lawful, the reviewing court moves to the second prong to determine whether the order is reasonable.  State ex rel. Praxair, Inc. v. Missouri Public Service Commission, 344 S.W.3d 178, 184 (Mo. banc 2011).  An order is reasonable if it "is supported by substantial, competent evidence on the whole record; the decision is not arbitrary or capricious or where the [Commission] has not abused its discretion."  State ex rel. Praxair, Inc., 344 S.W.3d at 184.

We defer to the Commission's findings of fact, but whether a statute applies to a given set of facts is a question of law this Court will review *de novo*.  State ex rel. Union Elec. Co. v. Pub. Serv. Comm'n, 399 S.W.3d 467, 477 (Mo. App. W.D. 2013).  It is the burden of the party seeking to set aside the Commission's order to prove by clear and satisfactory evidence that the order was unlawful or unreasonable.  Section 386.430; In re Request for an Increase in Sewer Operating Revenues of Emerald Pointe Util. Co., 438 S.W.3d 482, 489 (Mo. App. W.D. 2014).  This standard of review is applicable to all points on appeal.

Collateral Estoppel/Res Judicata/Judicial Estoppel/Collateral Attacks

Before considering MLA's and Farm Bureau's points on appeal, we must address Grain Belt's/MJMEUC's contention that this Court should decline to exercise jurisdiction over this consolidated appeal because the issues raised before this Court are barred under the doctrines of collateral estoppel and res judicata.  In short, Grain Belt/MJMEUC contend that MLA and Farm Bureau are attempting to re-litigate matters that were already tried and settled between the

7

parties. We find no merit in these claims because the two prior Commission orders relied upon by Grain Belt/MJMEUC to support their position were outright denials of Grain Belt's application for the CCN. As such, the Appellants prevailed in both instances and there was no logical reason to appeal the Commission's findings regarding its authority to issue the CCN.[9]

Similarly, we deny Grain Belt's/MJMEUC's arguments that MLA's evidentiary challenges are barred by the doctrines of judicial estoppel. MLA is allowed to raise these claims given that the CCN was initially denied and the matter eventually remanded to the Commission by the Missouri Supreme Court.

Finally, Grain Belt's/MJMEUC's arguments that Appellants' claims are collateral attacks on the Commission's Orders issued in EA-2014-0207 and EA-2016-0358 (Issue Date: August 16, 2017) in contravention of Section 386.550 are equally without merit as both of these earlier orders were decided in MLA's favor. Therefore, this appeal does not meet the criteria for a "collateral attack." See State ex rel. Fee Trunk Sewer, Inc. v. Litz, 596 S.W.2d 466, 468 (Mo. App. E.D. 1980) (A judgment favorable to plaintiff property owners in the underlying action would not result in rendering the order of the Commission ineffective and thus it did not constitute a collateral attack upon the order of the Commission; additionally, plaintiffs did not seek to have order of Commission modified, amended or declared void.)

_____

[9] Collateral estoppel/issue preclusion requires that the issue was fully and fairly litigated, that the issue was essential to the earlier judgment, and that the earlier judgment be final and binding on the party against whom it is asserted. Sexton v. Jenkins & Assocs., Inc., 152 S.W.3d 270, 273 (Mo. banc 2004). Res judicata, or claim preclusion, precludes re-litigation not only of those issues on which the court in an earlier case was required to pronounce judgment, but to every point properly belonging to the subject matter of litigation and which the parties, exercising reasonable diligence, might have brought forward at the time. Chesterfield Village, Inc. v. City of Chesterfield, 64 S.W.3d 315, 318 (Mo. banc 2002).

In Points I, II, and III of its brief, MLA argues that the Commission erred in admitting into evidence and/or in denying MLA access to certain documents or testimony. Specifically, MLA contends that the three documents at issue—the Loomis Study and two wind speed maps—were inadmissible under Section 536.070(11), and by extension the testimony based on these documents was also inadmissible.[10] Additionally, MLA contends its due process rights were violated when the Commission denied access to certain "confidential" documents that supported Grain Belt's claim regarding the cost of the Kansas wind generation. For ease of discussion, we address these evidentiary challenges together.

As stated above, pursuant to Section 386.510, our review of the Commission's final report and order "is two-pronged: 'first, the reviewing court must determine whether the [Commission's] order is lawful; and second, the court must determine whether the order is reasonable.'" Grain Belt Express Clean Line, LLC, 555 S.W.3d at 471. Here, none of MLA's points relied on allege that the Commission's report and order is unlawful or unreasonable under Section 386.510. Instead, in its brief, MLA admits:

> *None of the appellants are challenging the sufficiency of the evidence to support the Commission's final Report and Order. The MLA (and the other appellants represented by counsel for the MLA) concede for purposes of this appeal that the evidence which was admitted into the record in this case is sufficient to support the Commission's individual findings of fact, its conclusions that the project meets each of the five Tartan criteria, and the ultimate finding that the proposed project is necessary or convenient for the public service.* Accordingly, there is no need here to set forth in any further detail the evidence and findings which support the final Report and Order. [Emphasis added.]

---

[10] We note that MLA's "fruit of the poisonous tree" argument, under Point II, is inapplicable to civil or administrative proceedings. This exclusionary rule is an application of the Fourth Amendment rule that evidence discovered during a search and seizure conducted in violation of the Fourth Amendment must be excluded in *criminal* cases. See Riche v. Director of Revenue, 987 S.W.2d 331, 334-35 (Mo. banc 1999). Accordingly, we decline to address this Point further.

Based on this statement, MLA concedes that the Commission's report and order finding that the Grain Belt project is necessary or convenient for the public service and is supported by competent and substantial evidence on the whole record. Additionally, MLA does not establish why its allegations of error mean the report and order is not lawful or reasonable. MLA merely concludes in its brief that, "it is reasonable to assume that the evidence in question had a direct impact upon the Commission's decision." We find MLA's arguments lack merit.

Here, during the evidentiary hearing, the Commission admitted the testimony of 54 witnesses and 135 exhibits into evidence, which supported the Commission's ultimate finding that construction of the Grain Belt project is necessary or convenient for the public service. Our review of the record shows that the Commission carefully considered the evidence under the criteria set forth under the five Tartan factors, namely; a) there must be a need for the service; b) the applicant must be qualified to provide the proposed service; c) the applicant must have the financial ability to provide the service; d) the applicant's proposal must be economically feasible; and e) the service must promote the public interest.

Under the first factor, the Commission found there was need for the Grain Belt project. The Commission found that the Grain Belt project would benefit MJMEUC and MoPEP, as well other Missouri cities that have contracted to purchase wind energy from Kansas over the Grain Belt transmission line.[11] Under the second and third factors, the Commission found that Grain Belt established its qualifications and financial ability to support the Grain Belt project. Under the fourth factor, the Commission found that the Grain Belt project, by providing an alternative path for electricity between three North American transmission regions, will lead to lower transmission congestion costs for utilities, and reduce the cost to utilities of serving their load.

_____

[11] Missouri cities that have contracted to purchase wind energy from Kansas delivered over the Grain Belt transmission line include Kirkwood, Hannibal, Columbia, and Centralia.

10

Finally, under the fifth factor, the Commission found that Grain Belt's proposed route, based on a routing study, represents the best route to minimize the overall effect of the Grain Belt projects on the natural and human environment, while avoiding unreasonable and circuitous routes, unreasonable costs, and special design requirements. Additionally, the project would provide benefits to Missouri's adjusted energy production costs, provide benefits to Missouri's environmental and public health, and would have a favorable effect on the reliability of electric service in Missouri.

Having conceded that the Commission's Report and Order is supported by competent and substantial evidence on the whole record, MLA has failed to meet its burden to prove by clear and satisfactory evidence that the Commission's order was unlawful or unreasonable. For this reason alone, MLA's three points on appeal fail because the Commission's report and order is lawful and reasonable under Section 386.510.

We should also point out that MLA's arguments fail for an additional reason: MLA does not challenge the Commission's decision to admit the challenged documents under Section 490.065.3,[12] which was the basis on which the Commission admitted them, but instead insists that they were inadmissible under Section 536.070(11).

Section 536.070(11) allows the results of statistical examinations, studies, audits, and other summaries of voluminous information to be admissible in evidence in administrative contested cases. By comparison, Section 490.065.3 provides:

> The facts or data in a particular case upon which an expert bases an opinion or
> inference may be those perceived by or made known to him at or before the

---

[12] The documents were admitted during the Commission's March 2017 hearing. Section 490.065 was amended effective August 28, 2017. Section 490.065, RSMo (Supp. 2018). The statutory amendment did not change the standard for admission of expert testimony in administrative cases. See Section 490.065.1(3), RSMo (Cum. Supp. 2018), and Section 490.065(3), RSMo (2016).

hearing and must be of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and must be otherwise reasonably reliable.

Section 490.065 governs the admission of expert testimony in contested case proceedings before the Commission. State ex rel. Mo. Gas Energy v. Pub. Serv. Comm'n, 186 S.W.3d 376, 382 & n.3 (Mo. App. W.D. 2006) (citing State Bd. of Registration for Healing Arts v. McDonagh, 123 S.W.3d 146, 154-55 (Mo. banc 2003)). Documents that form the basis of an expert's opinion may be admissible under this statute. Klotz v. St. Anthony's Medical Ctr., 311 S.W.3d 752, 764 (Mo. banc 2010). Here, the record shows that the Commission admitted the three documents under Section 490.065(3), RSMo (2016), because they served as the basis for the experts' opinion testimony.

With respect to the first document, the U.S. Department of Energy's wind speed map attached to the testimony of Michael Goggin ("Goggin") was not relied upon by the Commission in reaching its decision. Instead, the wind speed map provided the basis for Goggin's expert opinion that Kansas has 952,371 megawatts of developable wind energy resources. MLA did not object that the map was not of the type reasonably relied upon or that it was otherwise unreliable. Section 490.065.3.

With respect to the second document, the wind speed map attached to the testimony of Grain Belt's witness, David Berry ("Berry"), was also properly admitted under Section 490.065.3. Berry testified that the wind speed map was "prepared by the National Renewable Energy Laboratory, a federal research laboratory that operates under the direction of the U.S. Department of Energy, and AWS Truepower, a leading meteorology firm." Relying partly on the wind speed map, Berry explained generating wind power in western Kansas is affordable because it "has some of the highest wind speeds in the country." The Commission accepted

Berry's testimony about the economic feasibility of producing inexpensive wind energy in western Kansas, noting the wind speeds only as background for Berry's ultimate opinion. As with the wind map relied on by Goggin, MLA made no objection that the wind speed map relied on by Berry is not the type of information reasonably relied on in forming opinions, or that it was otherwise unreliable. Section 490.065.3.

Finally, with respect to the third document, the Loomis study, MLA's arguments also fail. The expert witness for the Missouri Department of Economic Development, Alan Spell ("Spell"), testified that he used the Loomis study to estimate direct construction spending in order to estimate the economic impacts of the Grain Belt project. As with the wind speed studies, the Commission did not rely on the Loomis Study as independent substantive evidence; it merely served as background for Spell's opinion regarding the economic benefits of the Grain Belt project to the State of Missouri. MLA made no objection that the Loomis study was not of the type reasonably relied on in forming opinions about the economic impact of construction projects, nor did MLA object that the Loomis study was otherwise unreliable. Moreover, as with the wind speed maps, the Loomis study was not the only basis for Spell's economic impact analysis.

In all, the witnesses above provided testimony based on documents that were the type of studies reasonably relied on in forming their opinions, and were otherwise reasonably reliable. MLA has not challenged this fact. Under Sections 386.510 and 386.430, therefore, MLA has failed to meet its obligation to show by clear and satisfactory evidence that the Commission's report and order was not based on competent and substantial evidence on the whole record.

Finally, contrary to MLA's contention, the Commission did not err in denying MLA access during discovery to Grain Belt's "confidential" documents regarding Grain Belt's ability

13

to supply low cost energy from the wind farms in western Kansas. At issue is Berry's testimony that "[t]he lowest-priced 4,000 [megawatts] [the approximate capacity of the proposed line] of new wind generation was an average of 2.0 centers per kWh flat for 25 years."[13] Grain Belt provided over 260 pages of documents to MLA in response to Grain Belt's claim regarding the price at which power could be purchased from its line. Moreover, MLA conducted extensive cross-examination of Berry regarding his calculation and the Commission did not limit MLA's cross-examination of Berry in the evidentiary hearing.

Here, the Commission denied MLA's motion to compel discovery because it found MLA's request for additional information was not designed to lead to the discovery of admissible evidence, where the probative value of the information MLA sought was outweighed by its prejudicial effect. The Commission noted that MLA's data requests sought information regarding responses provided to Grain Belt from potential wind farm generators pursuant to a request for information ("RFI") as well as identification of the wind generators it used to calculate the lowest-priced cost of energy mentioned in the direct testimony of Berry. The Commission noted that Grain Belt provided considerable information in response to MLA's data requests that would permit MLA to develop close estimates of the wind speed and pricing information necessary to verify or challenge Grain Belt's energy cost estimates. The Commission concluded that, "[t]he balancing test for legal relevance indicates that the value of this additional information is outweighed by the prejudicial effects to Grain Belt . . . and the wind farm generators that responded to the RFI." Based on our review of the record, the Commission lawfully and reasonably found the documents requested by MLA to be proprietary and protected from its discovery request. See State ex rel. Utility Consumers Council v. Public

---

[13] Additionally, we note that the Commission did not rely on the testimony challenged in this point in its report and order.

14

Service Commission, 562 S.W.2d 688, 696-97 (Mo. App. E.D. 1978) (affirming Commission's order as lawful and reasonable because other evidence was available to the appellant that provided the same opportunity to challenge the company's case). For the reasons herein explained, Points I, II, and III are denied.

Definition of "Electrical Corporation"

In its sole point on appeal, Farm Bureau argues that the Commission erred in granting Grain Belt a CCN because the Commission lacks the statutory authority to issue such a CCN, in that Grain Belt does not meet the statutory definition of "electrical corporation" or a public utility providing a public use or service as required by Section 393.170.1. We disagree.

Under Section 393.170.1, "No … electrical corporation … shall begin construction of a[n] … electric plant … without first having obtained the permission and approval of the commission." Section 393.170.1. Electrical corporation is defined as "…every corporation, [or] company…owning, operating, controlling or managing any electric plant…" Section 386.020(15). Electric plant is defined as "all real estate, fixtures, and personal property…*used or to be used* for or in connection with or to facilitate the…transmission…of electricity for… power…" Section 386.020(14) [Emphasis added.] The word "used" indicates current use, while the phrase "to be used" indicates future use. The idea that property "to be used" indicates future use is further reflected in the requirement that authority to begin construction of electric plant be exercised "within a period of two years from the grant thereof." Section 393.170.3.

Here, the proposed Grain Belt transmission line and converter station fall squarely within the definition of "electric plant" under Section 386.020(14) because they are examples of "fixtures" and/or "personal property." Furthermore, Grain Belt's 39 transmission line easements with Missouri landowner are on "real estate … to be used" for or in connection with transmission

15

of electrical energy. That personal property and real estate therefore fall under the definition of "electric plant." Section 386.020(14).

Also, consistent with Section 386.020(15), Grain Belt is "controlling" the real estate on its 39 transmission line easements because under its easement agreements, Grain Belt has the right to "construct, operate, repair, maintain, and remove an overhead transmission line and related facilities, along with rights of access to the right-of-way for the transmission line." In other words, the easement agreements limit the landowners' legal rights and land use, "including prohibiting any landowner activity that would interfere with Grain Belt's use of the easement" or would interfere with future development of the transmission line. Therefore, Grain Belt is an "electric corporation" that is required to file a CCN before it can begin construction of its project across Missouri.

Additionally, Grain Belt currently owns cash on hand. Grain Belt's cash on hand falls within the definition of "electric plant" because it is "personal property … *to be used*… in connection with or to facilitate the … transmission … of electricity" and because Grain Belt will use its cash on hand to construct its transmission line and converter station. Section 386.020(14). Therefore, Grain Belt is an electrical corporation within the meaning of Section 386.020(15), and it is subject to the jurisdiction of the Commission.

Regarding "public utility," the relevant statutory definitions contain no explicit requirement that an entity be operated for a public use in order for it to constitute a public utility. However, Missouri courts have held that such a "public use" requirement was intended:

> While the definitions quoted supra [of "electric plant" and "electrical corporation," found now at Sections 386.020(11) and (12),] express therein no word of public use, or necessity that the sale of the electricity be to the public, it is apparent that the words "for public use" are to be understood and to be read therein. For the operation of the electric plant must of necessity be for a public use, and therefore be coupled with a public interest; otherwise the Commission

16

> can have no authority whatever over it. The electric plant must, in short, be devoted to a public use before it is subject to public regulation.

State ex rel. M.O. Danciger & Co. v. Pub. Serv. Comm'n, 275 Mo. 483, 205 S.W. 36, 38 (1918); see also Osage Water Co. v. Miller County Water Auth., Inc., 950 S.W.2d 569, 574 (Mo. App. S.D.1997) (facilities must be "devoted to a public use before [they are] subject to public regulation"); Khulusi v. Southwestern Bell Yellow Pages, Inc., 916 S.W.2d 227, 232 (Mo. App. W.D. 1995).

Here, the evidence showed that when the Grain Belt project is constructed and begins operation, it will transmit energy from wind farms in Kansas to wholesale customers in Missouri. In the case of MJMEUC, those customers are Missouri cities and towns that serve as electric providers to approximately 347,000 Missouri citizens. An entity, such as Grain Belt, that constructs and operates a transmission line bringing electrical energy from electrical power generators to public utilities that serve consumers is a necessary and important link in the distribution of electricity and qualifies as a public utility. State ex. Rel. Buchanan County Power Transmission Co. v. Baker, 320 Mo. 1146, 9 S.W.3d 589 (Mo. 1928). Therefore, Grain Belt's project will serve the public use, and Grain Belt qualifies as a public utility.

Farm Bureau contends that Grain Belt is not subject to the Commission's jurisdiction because it will be engaged in the interstate transmission of electricity and the Commission's authority does not apply to interstate commerce, except insofar as the same may be permitted under the provisions of the Constitution of the United States and the acts of Congress. Sections 386.250(1) and Section 386.030. Farm Bureau further contends that the Commission does not have jurisdiction because Grain Belt will only provide wholesale transmission service in Missouri, not retail service, and those customers may pay different rates for capacity, as Grain

17

Belt will be subject to regulation by the Federal Energy Regulatory Commission ("FERC") and not subject to rate regulation by this Commission.[14]

Here, as the Commission correctly argues, its authority to grant a CCN for construction of transmission lines is established under Section 393.170.1, and is not preempted by federal law. Only its authority to regulate the rates of wholesale interstate transmission service is preempted by federal law. The evidence showed that Grain Belt will offer indiscriminate transmission service through an open access transmission tariff that will be filed and subject to the jurisdiction of the FERC. Therefore, the fact that FERC regulates wholesale electric rates does not mean that this Commission lacks the authority to issue a CCN for construction of the Grain Belt Project.

Moreover, the states are granted authority to regulate other matters not specifically granted to the federal government. Here, the jurisdiction of the Commission extends "[t]o the manufacture, sale or distribution of … electricity for light, heat and power, within the state, and to persons or corporations owning, leasing, operating or controlling the same; and to … electric plants, and to persons or corporations owning, leasing, operating or controlling the same." Section 386.250(1). Therefore, the Commission's authority does not apply to interstate commerce, except insofar as the same may be permitted under the provisions of the Constitution of the United States and the acts of Congress. Section 386.030. Since the Grain Belt Project will transmit energy to a converter station located in Missouri to provide that energy to Missouri citizens, neither FERC regulations nor Sections 386.250(1) and 386.030, operate to deprive this Commission of the jurisdiction to decide this CCN case.

---

[14] The Federal Power Act permits the FERC to set interstate wholesale transmission rates either by tariff or with individual electricity purchasers through bilateral contracts. Morgan Stanley Capital Group, Inc. v. Pub. Util. Dist. No. 1 of Snohomish County, 554 U.S. 527, 530 (2008). Rates set by tariffs and negotiated contract are both subject to the same "just and reasonable" standard under the Federal Power Act. Id. FERC can, in response to a complaint or on its own motion, determine that a negotiated rate is not just and reasonable and replace it with a lawful rate. Id.

18

Finally, we note that in remanding this case back to the Commission, the Missouri Supreme Court expressly indicated that the Grain Belt project was "an interstate transmission line," but it was for the Commission to determine if the Grain Belt project met the criteria for granting a CCN, thereby suggesting that the Commission indeed has the authority to issue, if it so decides, a CCN in this case. Grain Belt Express Clean Line, LLC, 555 S.W.3d at 471, 474.

For all the reasons stated herein, the Commission has the legal authority to issue a CCN to Grain Belt for the construction of the Grain Belt project. Point denied.

<u>Conclusion</u>

We affirm the Commission's report and order.

_____
Honorable Mary K. Hoff

Sherri B. Sullivan, Judge and Angela T. Quigless, Judge: Concur