Leo MAAG, Warren Faris, J. T. Rutledge, Ezra Sehlke and Edwin Sehlke, Individually, and Doing Business As Chariton County Contractors, Appellants,

v.

PUBLIC SERVICE COMMISSION of Missouri, Respondent.

No. 23995.

Kansas City Court of Appeals.

Missouri.

Dec. 7, 1964.

Hulen & Hulen, Moberly, for appellants.

Thomas J. Downey, Asst. Counsel, Jefferson City, for respondent.

BROADDUS, Presiding Judge.

By an Order dated October 11, 1961, Hall & Riley Quarries & Construction Company, Booneville, Missouri; Land Construction Company, St. Joseph, Missouri; Chariton County Contractors, Salisbury, Missouri; Leo Maag, Salisbury, Missouri; Warren Faris, Keytesville, Missouri; J. T. Rutledge, Salisbury, Missouri; and Ezra Sehlke and Edwin Sehlke, doing business as Sehlke, Keytesville, Missouri, were cited to appear before the Public Service Commission on October 23, 1961, to answer charges that they have provided or procured, aided or abetted in transportation services at rates other than those named in tariff schedules lawfully on file with

the Commission; have performed for-hire transportation service in vehicles to which have not been affixed annual license required in Section 390.136, RSMo 1959, V. A.M.S.

On October 23, 1961, a hearing was held and on March 12, 1962, the Commission issued its Report and "Ordered: That Leo Maag, Warren Faris, J. T. Rutledge and Ezra Sehlke, doing business as Chariton County Contractors, be and they are hereby ordered to cease and desist in providing transportation service such as found by the Commission in this case to constitute transportation for compensation."

Thereafter, on April 16, 1962, a writ of certiorari was duly issued to the Public Service Commission by the Circuit Court of Cole County, and a return to said writ was made. By agreement of the parties the cause was submitted to the Court on the Record. Thereafter, on September 23, 1962, the Court affirmed the order of the Commission and this appeal followed.

An examination of the transcript discloses that the Commission's Finding constitutes a fair statement of the facts and we adopt it. It is as follows:

"Land Construction Company, which will frequently be referred to herein as the Contractor, was the successful bidder on a Missouri State Highway Commission project calling for the paving of 8.593 miles of U. S. Highway 65 in Carroll County between Carrollton and the Missouri River with 24-foot asphaltic concrete, designated as Project Rt. 65, Sec. 17(2). Bids were received on July 27, 1961, and the award was made on August 8, 1961. Approximately 30,000 tons of crushed stone are required to complete the project.

"Hall and Riley Quarries & Construction Company, which will frequently be referred to herein as the Quarry Company, is engaged in the business of producing and selling aggregate used in highway construction. It operates a quarry approximately six miles south of Marshall, Missouri, at which stone is produced which meets the Highway Department specifications for asphaltic concrete.

"The following respondents own and operate one or more dump trucks and are the holders of certificates of convenience and necessity issued by the Commission authorizing the transportation of bulk commodities in dump trucks as common carriers between points in Missouri, including Carroll County: Leo Maag, Certificate No. T-13,590; Warren Faris, Certificate No. T-604; J. T. Rutledge, Certificate No. T-13,398; and Ezra and Edwin Sehlke, d/b/a Sehlke, Certificate No. T-13,591. Each of these trucker respondents has on file with the Commission the necessary insurance and tariff schedule and is fully qualified to operate as a common carrier over the highways by motor vehicle. The orders granting certificates to these respondents relate that the applicants for such authority have been engaged in the business of transporting bulk commodities in dump trucks for several years.

"Chariton County Contractors is the fictitious name used by a partnership consisting of Leo Maag, J. T. Rutledge, Warren Faris and W. N. (Ezra) Sehlke, and will frequently be referred to herein as the Partnership. An application for registration of the fictitious name was filed with the Secretary of State's Office on September 11, 1961, and shows percentage of ownership as follows: Leo Maag, 40 percent; J. T. Rutledge, 30 percent; Warren Faris, 10 percent and E. N. Sehlke, 20 percent. Application was also made by the Partnership on September 11, 1961, to the State Department of Revenue for a code number used by retailers in paying sales or use tax. The application shows the kind of business to be "trucking" and indicates the business was commenced on September 11, 1961.

"On August 5, 1961, a letter signed by W. E. Herzog, Vice-President of the Contractor, was addressed to the Partnership,

Attention Mr. Maag, confirming acceptance of a quotation of $2.30 a ton for stone to be used on the project designated as Rt. 65, Sec. 17(2), Carroll County. On the lower left-hand side of the letter, in a space provided for that purpose, was the acceptance of the terms of the quotation signed on behalf of the Partnership by Leo Maag. The letter agreement reads as follows:

'This is to confirm our acceptance of your quotation of $2.30 per ton for stone to be used on the subject project, delivered to our plant set-up site within a distance of one mile north of the Missouri River Bridge, on Route 65, Carroll County, Missouri.

'Our acceptance of your quotation is based on your committment that adequate trucks will be available to haul the stone from the Hall & Riley Quarries and Construction Company Quarries located approximately six miles south of Marshall, Missouri, at a rate which may possibly require 1,000 tons per day. (Approx. 30,000 T. will be required.)

'Further, your quotation will include all Insurance for both Payrolls and Liability. We will expect Certificate of your Liability Insurance to be sent to us for our files. We will pay you at any time you present us with a statement covering materials delivered to our stockpile area, and approved by the Missouri State Highway Commission, and we would suggest the billing be made the first of each month, which we will pay by the tenth. However, if payment is desired more frequently, we will expect to pay accordingly.

'The above acceptance of your quotation is based on a $1.20 per ton price, and $1.10 per ton haul price. The acceptance is also based on the fact that the work on the project will be awarded to us by the Missouri State Highway Commission. As of this date, the work has not been awarded.

'Please indicate your acceptance by signing the original of this letter, and returning it to us for your files.'

"The letter indicates that a copy was sent to the Quarry Company, attention Mr. D. L. Riley. The original of the letter was in the files of the Contractor and the duplicate was in the possession of Mr. Maag.

"On August 8, 1961, a letter signed for the Partnership by Leo Maag was addressed to the Quarry Company, attention Mr. D. L. Riley, confirming the acceptance of a quotation of $1.20 a ton for the stone to be used on Rt. 65, Sec. 17(2), Carroll County, Missouri. The letter reads as follows:

'This is to confirm our acceptance of your quotation of $1.20 per ton stone price, to be used on Rt. 65 Sec. 17(2), Carroll County, Missouri.

'Our acceptance is based on your committment to supply approximately 1,000 tons per day or a total of approximately 30,000 tons.

'We suggest you mail us a statement on the first of each month for the material we have received and we will pay by the fifteenth.

'This acceptance is also based on the fact that the work on this project will be awarded to Land Construction Co., by the Missouri State Highway Commission. As of this date, the work has not been awarded.

'Please indicate your acceptance by signing the original of this letter and returning it to us for our files.'

"On the lower left-hand side, in a space provided for that purpose, was the acceptance on behalf of the Quarry Company signed by D. L. Riley. The letter indicated that a copy was sent to the Contractor, attention Mr. W. E. Herzog, Vic-President.

"Delivery of the stone under the agreed terms began on September 11, 1961. Under

date of September 30, 1961, the Contractor was billed by the Partnership for 4,473.05 tons of rock at $2.30 a ton, or $10,288.02 plus $205.76 state sales tax for a total amount of $10,493.78. This bill was paid on October 7, 1961.

"A check payable to the Quarry Company and drawn on the Partnership account by Leo Maag, in the amount of $5,376.66, was issued on October 9, 1961 (Resp's. Ex. D), and a receipted invoice showing that the above amount represented payment in full for 4,473.05 tons of rock at $1.20 a ton was issued by the Quarry Company on October 12, 1961. The check was deposited in the account of the Quarry Company in the Kemper-State Bank, Booneville, Missouri, on October 18, 1961.

'The quarry at which the stone was produced is located approximately six miles south of Marshall, or 28 miles from the site at which the stone was stockpiled. Transportation of the stone was by dump trucks. The Partnership owns no motor vehicles. Of the vehicles used in performing the transportation, four are owned by Leo Maag, three by J. T. Rutledge, one by Warren Faris and two by Ezra Sehlke. These vehicles are not leased to the Partnership nor are they in any way identified as being operated by the Partnership. Each of the vehicles has the name and address of its owner and his P. S. C. certificate number painted on its side, although there is some evidence that for some or all of the hauls the certificate number was taped over. Annual license stickers were not affixed to the vehicles.

"In transportation performed for account of the Partnership, each of the individual truck owners pays his own driver, including social security and workmen's compensation insurance, and all operating expenses for the truck. Each owner provides for his own liability insurance and the Partnership is not named as a co-insured.

"All of the records of the Partnership are kept by Leo Maag in the office of the Leo Maag Trucking Service at Salisbury. Mr. Maag has one office clerk but the Partnership has no employees. Money received by the Partnership is deposited to its credit in the Salisbury Savings Bank. Checks are drawn on this account by Mr. Maag. After payment from the account for stone purchased, the balance is distributed to the individual truck owners on the basis of the number of tons each has transported, less 5 cents a ton which is retained for office expense and other service provided by Mr. Maag. After payment to the Quarry Company for the 4,473.05 tons of rock delivered during the period of September 11–29, 1961, there was a balance of $4,920.36 remaining of the amount paid by the Contractor to be distributed to the truck owners and for office expense. The following table shows the number of tons of rock transported by the individual truck owners during the period of September 11–29, 1961, the amount due the truck owners at $1.05 a ton, the balance remaining for office expense and other services provided by Mr. Maag, and the amount that would be due each truck owner if the dump truck rate prescribed by the Commission had been charged:

| Truck Owner | Tons Hauled | Amount Paid Truck Owner | Balance for Office Expense | Charge at P.S.C. Rate |
|---|---|---|---|---|
| Maag | 1,920.95 | $2,017.00 | $ 96.05 | $2,631.70 |
| Sehkle | 438.30 | 460.21 | 21.92 | 600.47 |
| Rutledge | 1,415.75 | 1,486.54 | 70.79 | 1,939.58 |
| Faris | 537.25 | 564.11 | 26.86 | 736.03 |
| Sehlke & Faris | 160.80 | 168.84 | 8.04 | 220.30 |
| Totals | 4,473.05 | $4,696.70 | $223.66 | $6,128.08 |

"In appendix 'A' to this Report and Order, there is shown the number of loads transported on the vehicles of each truck owner on each work day during the period September 11–29, 1961.

"The tariff charges shown in the above table were computed at a rate of $1.37 a ton, which is the rate prescribed by Order of September 30, 1958, in case T-16,446 for a distance of 28 miles from an origin in Saline County. The prescribed rates have been published for account of the respondent carriers, in tariff schedules filed with the Commission in the manner required by law."

The conclusions of the Commission's Order which are being attacked by appellants are as follows:

"The principal question to be decided by the Commission in this case is whether the transportation of stone from the quarry to the stockpile is common carriage and subject to the laws applicable thereto or private carriage which is exempt from regulation by the Commission.

"It is the contention of the respondents that the Partnership is engaged in buying and selling rock and that transportation of the rock is performed by it as private carriage. The term 'private carrier' is defined by Section 390.020(7), RSMo. 1959, to mean 'any person engaged in the transportation by motor vehicle upon public highways of persons or property, or both, but not as a common carrier by motor vehicle or a contract carrier by motor vehicle; and includes any person who transports property by motor vehicle where such transportation is incidental to or in furtherance of any commercial enterprise of such person, other than transportation.'

"There is no service performed by either the Partnership or the individuals who comprise it from which a profit can be gained except the service of transportation. The only invest-ment of the individual partners is in dump trucks. There is no investment by the individuals or the Partnership in any stock in trade, payment for the stone being made to the quarry only after it is paid by the Contractor. The usual risks in buying and selling a commodity are not involved. Both the source of the stone and the market for it have been assured in advance. *It is the conclusion of the Commission that the transportation is not incidental to or in furtherance of the business of buying and selling stone but, to the contrary, buying and selling of the stone is for the sole purpose of furthering the principal business of transportation for hire.*

"The Partnership is not engaged in the transportation of property by motor vehicle. It owns no vehicles and the vehicles used in its business are not under lease to it. The vehicles carry no identification as being operated by the Partnership and there is no indication of any supervision or control over the vehicles by the Partnership. Transportation is purchased from the owners of the vehicles in a specified amount per ton, which is the identical method of compensation of for-hire carriers, differing only in that the amount in this case is substantially less than the rate prescribed for common carriers by motor vehicle for a similar haul. In fact, *it seems abundantly clear the only motive for such an arrangement was to cut the rates, which the truck owners would have had to charge if the transportation had been rendered under their Public Service Commission authorities, and thereby obtain a competitive advantage over other carriers.* It is the conclusion of the Commission that as to each of the loads listed in appendix 'A' to this Report and Order, the individual truck owners were engaged in the transportation by motor vehicle of property for hire or compensation upon the public highways as

common carriers; that such transportation has been performed with vehicles operated without the annual license required by Section 390.136, RSMo.1959; and that such transportation has been rendered for rates other than published in the carriers' tariff schedules in violation of Section 387.-100, RSMo.1959." (Italics ours)

The function of the Courts in reviewing orders of the Public Service Commission is to determine the lawfulness or reasonableness of the order. The lawfulness of the order depends primarily on whether the Commission had statutory authority and power to issue the order; and for the order to be reasonable it must have been based upon competent and substantial evidence upon the whole record. State ex rel. City of West Plains v. Public Service Commission, 310 S.W.2d 925, Mo.Sup.; State ex rel. Chicago, Rock Island & Pacific Railroad Company v. Public Service Commission, 312 S.W.2d 791, Mo.Sup. 'In a recent case before this court reviewing an order of the Commission we discussed the basic principles of review as follows: State ex rel. Associated Transports, Inc., v. Burton et al., Mo.App., 356 S.W.2d 115:

"(1) The order of the Commission in this case is prima facie lawful and reasonable. Section 386.270 V.A.M.S.; State ex rel. Egan v. Public Service Comm., Mo.App., 319 S.W.2d 917. In seeking to set aside the determination made by the Commission, Associated has assumed the burden laid upon it by statute to show by clear and satisfactory evidence that the order complained of is unreasonable or unlawful. Section 386.430 V.A.M.S.; State ex rel. Dairyland Transport Corp. v. Public Service Comm., Mo. App., 350 S.W.2d 825; State ex rel. Transport Delivery v. Burton, Mo. App., 317 S.W.2d 661.

"(2) The issues raised on this appeal are not triable de novo by this court.

The only question for our determination, relative to the merits of the case, or that the trial court could have determined, is whether or not the Commission's order is reasonable and lawful and supported by competent and substantial evidence. Section 386.510 V.A.M.S.; State ex rel. Hotel Continental v. Burton, Mo.Sup., 334 S.W.2d 75; State ex rel. Transport Delivery Co. v. Burton, Mo.App., 317 S.W.2d 661. As a reviewing court, we may not substitute our judgment on the evidence for that of the Commission. 'Upon appeal to this court on a matter of this character we do not determine the question presented as though we were the Commission. We only determine whether or not the order made by the Commission is reasonable and lawful, in light of the facts and circumstances properly in evidence before it'. State ex rel. Shepherd et al. v. Public Service Commission, Mo.App., 142 S. W.2d 346; State ex rel. Dairyland Transport Corporation v. Public Service Commission, Mo.App., 350 S.W.2d 825."

If the partnership is to successfully claim a "private carrier" status it must be engaged in a commercial enterprise other than transportation, and the transportation of rock by the Partnership must be incidental to or in the furtherance of such commercial enterprise. The Partnership claims that its principal business is that of supplying rock. It is contended that the dump truck transportation is merely incidental to or in furtherance of its commercial enterprise as a rock supplier.

The claim of the Partnership that it is engaged in the principal business of a rock supplier is overwhelmingly repudiated by the record. The rock for the road project was material for asphaltic concrete mix and had to meet definite specifications. Rock produced by the Hall & Riley Quarries & Construction Company met the required specifications and this company had submitted a bid to the road Contractor to

supply the rock for $1.20 per ton. The contract between the Partnership and the road Contractor provided that the source of the rock was to be the Hall & Riley Quarries & Construction Company and that the rock price was to be $1.20 per ton. The Partnership's only witness before the Commission testified that it was agreed that Hall & Riley Quarries & Construction Company was to furnish the rock. A Witness for the road Contractor testified that the road Contractor exercised control over the source of rock and that the road Contractor had required in this case that the rock come from Hall & Riley Quarries & Construction Company. It therefore appears beyond a shadow of a doubt that Hall & Riley Quarries & Construction Company was the rock supplier rather than the Partnership.

Inasmuch as the Partnership was not engaged in a commercial enterprise such as a rock supplier the transportation performed could not have been incidental to or in the furtherance of such a commercial enterprise. The record clearly demonstrates that the principal commercial enterprise of the Partnership was in fact the transportation of rock by dump trucks. In its application to the Department of Revenue for a sales tax number the Partnership stated that it was in the trucking business. The principal service which the road Contractor expected from the Partnership was transportation of rock. The Partnership's witness testified that the contribution of the individual partners to the Partnership's activity was transportation, and the profits of the Partnership are distributed to the individual members according to the number of tons hauled by each member. The Partnership's contract with the road Contractor specifically provided payment of $1.10 per ton for hauling the rock. Thus, the record fully supports the Commission's conclusion that the principal business of the Partnership and its individual members is the transportation of rock for hire or compensation upon the public highways.

Although the principles outlined in the Commission's order have never been either approved or rejected by the Appellate Courts of this State, those principles have been approved by the Federal Courts in construing similar provisions of the Interstate Commerce Act. See Interstate Commerce Commission v. Asphalt Supply Co., D.C., 152 F.Supp. 559; A. W. Stickle & Co. v. Interstate Commerce Commission, 10 Cir., 128 F.2d 155; Scott v. Interstate Commerce Commission, 10 Cir., 213 F.2d 300.

We have reached the conclusion that the Order of the Commission is in all respects lawful and reasonable and that the judgment of the Circuit Court upholding it should be affirmed. It is so ordered. All concur.