STATE ex rel. OZARK ELECTRIC COOPERATIVE, Appellant,

v.

PUBLIC SERVICE COMMISSION of the State of Missouri, Respondent,

The Empire District Electric Company, Intervenor.

No. KCD 27581.

Missouri Court of Appeals, Kansas City District.

Oct. 6, 1975.

Application to Transfer Denied Dec. 8, 1975.

Almon H. Maus, Monett, Gregory C. Stockard, Jefferson City, for appellant.

Leland B. Curtis, Com'n Counsel, Michael K. McCabe, First Asst. Com'n Counsel, Jefferson City, for respondent, Missouri Public Service Com'n.

Robert L. Hawkins, Jr., James C. Swearengen, Graham & Hawkins, Jefferson City, for intervenor.

Before SOMERVILLE, P. J., PRITCHARD, C. J., and TURNAGE, J.

SOMERVILLE, Presiding Judge.

Ozark Electric Cooperative (Ozark), with marked tenacity, has run the gamut of procedural remedies to date in an effort to nullify an order of the Public Service Commission (Commission) granting a certificate of convenience and necessity to Empire District Electric Company (Empire) to render electric service to an unincorporated area in Greene County, Missouri. After invoking judicial review of the Commission's order before the Circuit Court of Cole County, and failing there to upset it, Ozark now resorts to this court in its nullification effort.

The entire matter is permeated with a familiar ring for those acquainted with the ever increasing territorial competitiveness in unincorporated "rural" areas between unregulated electric utilities such as Ozark and regulated utilities such as Empire. The increased competitiveness just mentioned,

brought about by high density population points in traditionally unincorporated "rural" areas, may have rendered the statutory distinction between regulated and unregulated purveyors of electric energy therein a superannuated concept. However, if so, it is a matter to be legislatively addressed.

Ozark's thesis on appeal is bifurcated—(1) a dearth of competent and substantial evidence on the whole record to show a public need for the electric service to be rendered by Empire in the certified area and (2) a duplication of electric facilities contrary to law and the public interest if the Commission's order is permitted to stand.

■■■ A unanimity of opinion exists between Ozark, appellant herein, and Empire and the Commission, respondents herein, as to the scope of appellate review of the Commission's order. As forged by the constitution of this state, codified by statute, and judicially construed on numerous occasions, the scope of judicial review of the Commission's order is sharply drawn in that it is relegated to a determination of whether it was lawful and reasonable. Mo.Const. Art. V, Sec. 22; Section 386.510, RSMo Supp.1973; *State ex rel. Hotel Continental v. Burton*, 334 S.W.2d 75, 78 (Mo.1960); *Maag v. Public Service Commission*, 384 S.W.2d 801, 806 (Mo.App.1964); and *State ex rel. Beaufort Transfer Co. v. Clark*, 504 S.W.2d 216, 217 (Mo.App.1973). The question of the order's "lawfulness" turns on whether the Commission had statutory authority to issue it. *Maag v. Public Service Commission*, supra, and *State ex rel. Beaufort Transfer Co. v. Clark*, supra. The question of the order's "reasonableness" turns on whether it is supported by the competent and substantial evidence on the whole record. *State ex rel. Kansas City Transit, Inc. v. Public Service Commission*, 406 S.W.2d 5, 11 (Mo. banc 1966); *Maag v. Public Service Commission*, supra; and *State ex rel. Beaufort Transfer Co. v.*

*Clark*, supra. Section 393.170, RSMo 1969, empowered the Commission with authority to issue the controversial certificate of authority if, "after due hearing", it determined that such was "necessary or convenient for the public service". See also *State ex rel. Consumers Public Service Co. v. Public Service Commission*, 352 Mo. 905, 180 S.W.2d 40, 44–45 (Banc 1944). Determination of the lawfulness of the Commission's order in granting the certificate of authority requires a concomitant determination of whether it was reasonable. If there is competent and substantial evidence on the whole record that the certificate of convenience and necessity awarded to Empire was "necessary and convenient for the public service", then the Commission's order in granting the certificate was both reasonable and lawful. If the opposite be true, then the order of the Commission granting the certificate of authority was both unreasonable and unlawful.

The "whole record" lends itself to being fairly summarized as follows:

Geographically, the certified area comprises a tract of ground approximately two and one-half miles by two and one-half miles lying west of the city limits of Springfield, Missouri, and closely adjacent to the south city limits of Willard, Missouri.

The certified area lies within an eight mile wide corridor that rings the city limits of Springfield. For a number of years electric service in the eight mile wide corridor was predominantly furnished by Ozark and the city utilities plant of Springfield. Prior to 1958 electric energy furnished by the city utilities plant of Springfield to users in the corridor area was purchased at wholesale from Empire pursuant to a contract. During the life of said contract, and in compliance with the terms thereof, Empire desisted from seeking authority for serving users in the corridor area. However, on the expiration of said contract, and more particular-

ly since 1958, empire at various times sought and obtained authorization to serve a rather limited number of users in the corridor area, and, additionally, since 1927 has continuously served the electric energy needs of the city of Willard. The city of Willard lies in close proximity to the outer perimeter of the eight mile wide corridor heretofore mentioned.

Empire's application for the litigated certificate of convenience and necessity was prompted by a request for electric service from Thomas B. Smith, who in conjunction with his wife owned the Park Crest Water Co. Park Crest Water Co. was in the process of developing a 360 acre tract in the south part of the certified area. The development, known as Villa Park Heights, was to contain 640 single family dwellings, 200 apartment units, an "all electric shopping center", an "electric water pump", and an elevated water storage facility. As of the date of the hearing conducted by the Commission, Park Crest Water Co. had expended over one-half million dollars in the development of Villa Park Heights. Smith was adamant that electric service to Villa Park Heights be implemented by an underground distribution system and he wanted electric service for Villa Park Heights to be provided by a supplier who had experience with underground facilities. Empire had the requisite experience. Ozark's experience was somewhat limited and by the admission of one of its officers it had never installed an underground distribution system in a "complete subdivision". Smith had previously encountered difficulty with unregulated suppliers of electric energy and, accordingly, desired Empire to serve the needs of Villa Park Heights so that the consumers therein would have recourse to the Commission if service was not what it should be. Empire is subject to the regulatory power of the Commission regarding service to consumers (Section 393.140, RSMo 1969) while Ozark is not (Section 394.160, RSMo 1969).

Empire is both a producer and retail distributor of electric energy. Ozark possesses no production facilities and is merely a retail distributor of electric energy purchased from other sources. Ozark had no assurance that it possessed an impervious source of power for servicing the certified area.

Empire proposed to service the certified area by tapping one of its existing 69 KV lines which currently ran within one mile of Willard, constructing a "step-down" substation on a site in Willard, and then bringing 12 KV 3-phase service underground from the substation for a distance of two miles into Villa Park Heights and thence to other facilities in the certified area. Empire's proposed method of servicing the certified area was financially feasible and would not place a financial burden on any of its existing customers.

Ozark proposed to serve the electric energy needs of Villa Park Heights by tapping a 69 KV distribution line owned by KAMO Electric Cooperative, constructing a substation approximately two and one-half miles west of Villa Park Heights, and then bringing 3-phase underground service to Villa Park Heights from said substation.

Although Ozark is presently serving approximately ninety customers in the certified area, all of whom are north of and beyond the perimeter of Villa Park Heights, Ozark's existing facilities in the general area are only sufficient to meet its present customer load, plus approximately fifty to one hundred additional homes whether they be in Villa Park Heights, the remainder of the certified area, or the general area surrounding the certified area, and, accordingly, Ozark's present facilities are insufficient to serve in toto a development as large as Villa Park Heights. Moreover, Ozark intended to proceed with construction of its

proposed substation in order to meet its anticipated load requirements in the general area regardless of whether or not Empire was granted the certificate of convenience and necessity herein questioned.

■ For some reason, either intentional or otherwise, the General Assembly has not seen fit to statutorily spell out any specific criteria to aid in the determination of what is "necessary or convenient for the public service" within the meaning of such language as employed in Section 393.170, supra. Some aid is afforded, however, by the broad, pervasive legislative intent discernible from Chapter 393, RSMo 1969, so far as it is relative to regulation of electric utility companies. More particularly, Section 393.-130, RSMo 1969, contains language that gives some indicia that the General Assembly, among other things, concluded that the public interest would be served by requiring regulated electric utilities to render electric service by means of "adequate" facilities. This exemplary goal can not be vacuumized when determining whether or not there was competent and substantial evidence that the territorial authority sought by and granted to Empire was "necessary and convenient for the public service", and it gives a sense of direction as to what serves public necessity or convenience when judicially testing the reasonableness and lawfulness of the Commission's order. Consequently, it is not judicially remiss to conclude that "adequate" facilities, although not an exclusive criterion, is in and of itself a proper criterion for determining whether a grant of territorial authority is "necessary or convenient for the public service". The relative experience of competing suppliers of electric energy regarding the type of facilities to implement the service to be afforded certainly bears a direct relationship to the criterion of "adequate" facilities. Likewise, "adequate" facilities is akin to the greater ability of one utility as opposed to another to provide a more reliable source of electric energy to consumers.

■ Empire's experience relative to underground distribution systems vis-a-vis the limited scope of Ozark's experience, in conjunction with Empire's possession of facilities for both the production and distribution of electric energy vis-a-vis Ozark's possession of facilities solely for retail distribution of power purchased from others, impels this court to conclude that there was competent and substantial evidence on the whole record before the Commission to support its order awarding the requested certificate of convenience and necessity to Empire, and, perforce, the order of the Commission doing so was both lawful and reasonable.

This court is not unmindful that the tack of the first prong of Ozark's bifurcated thesis on appeal is, in a sense, both negative and affirmative. It is negative in the sense that Ozark claims that no competent and substantial evidence exists to support the Commission's order, and affirmative in the sense that Ozark claims that the expressed preference of Smith (one of the principal owners of Park Crest Water Co., developer of Villa Park Heights) and the fact that Ozark was a cooperative as opposed to a fully regulated utility such as Empire would not establish a public need for the service for which Empire sought certification. In view of what has been said, it is unnecessary to discuss the affirmative aspect of the first prong of Ozark's bifurcated thesis in order to affirm the Commission's order.

Respecting the second prong of Ozark's bifurcated thesis, i. e., that certification of Empire would result in a duplication of electric facilities contrary to law and public interest, the same is unavailing if for no other reason than the fact that there was competent and substantial evidence, and this court construes the order of the Commission as so finding, that implementation of the certificate of convenience and necessity awarded to Empire would not have the effect of duplicating or overlapping Ozark's present facilities in view of Ozark's antici-

pated increased customer load in the general area surrounding the certificated area.

This court makes no claim to apocalyptic vision. It must take the measure of issues in a given case by existing principles when available, whether statutorily prescribed or case law oriented, and by logic and reason when unavailable and not otherwise statutorily proscribed. On this latter basis it concludes that the order handed down by the Commission was lawful and reasonable and therefore undented by the forays launched against it by Ozark.

Judgment affirmed.

All concur.