STATE ex rel. the GAS SERVICE COMPANY, Appellant,

v.

PUBLIC SERVICE COMMISSION of Missouri, Respondent,

City of Harrisonville, Intervenor.

No. KCD 29101.

Missouri Court of Appeals, Kansas City District.

Feb. 6, 1978.

Motion for Rehearing and/or Transfer Denied March 16, 1978.

Application to Transfer Denied April 10, 1978.

Robert L. Hawkins, Jr., Jefferson City, Donal D. Guffey, Kansas City, for appellant.

Leland B. Curtis, Gen. Counsel, James S. Haines, Jr., Counsel, Jefferson City, for Public Service Commission.

James E. Thompson, Jr., Harrisonville, for intervenor.

Before SWOFFORD, P. J., and DIXON and PRITCHARD, JJ.

PRITCHARD, Judge.

The Gas Service Company appeals from a judgment of the circuit court affirming an order of PSC disapproving Gas Service's proposed tariff to become effective October 5, 1973, limiting its obligation to provide natural gas service in those Missouri communities solely served with gas purchased at wholesale from Panhandle Eastern Pipe Line Company to then connected customers at their then existing usage levels.

Intervenor, City of Harrisonville, is one of the communities affected, in that any new customers, such as those in newly developed subdivisions, would not be able to hook on to existent gas service to the city. The issue is whether PSC's order is reasonable and lawful under the standard of review set forth in § 386.510, RSMo 1969, and cases construing it, e. g., that the question of the order's "lawfulness" turns on whether PSC had statutory authority to issue it; and "reasonableness" turns on whether the order was supported by competent and substantial evidence on the whole record. *State ex rel. Ozark Electric Coop. v. Pub. Serv. Com'n*, 527 S.W.2d 390, 392[1] (Mo. App.1975), and cases cited.

Gas Service obtains its natural gas supply from two interstate pipeline companies: Cities Service Gas Company and Panhandle, the latter furnishing about 4% to 5% of all the gas that is sold by Gas Service, and Cities Service furnishes the balance. Harrisonville is served solely by Panhandle, along with 12 other incorporated communities [Armstrong, Centerview, Clarksburg, Drexel, Fayette, Houstonia, Hughesville, Palmyra, Pilot Grove, Tipton and Windsor], and two unincorporated areas by Panhandle. Panhandle is obligated to deliver 34,600 MCF daily to Gas Service in Missouri by the contract between them dated September 16, 1970, of which 16,915 MCF is designated to the unrestricted main line, and 17,685 MCF to the local restricted areas. Harrisonville takes 4,790 MCF daily of the latter amount.

In 1971, Panhandle filed with the Federal Power Commission [FPC, now the Federal Energy Regulatory Commission, FERC, 42 U.S.C.A., § 7151(b)] a tariff revision plan relating to curtailment of deliveries to its customers during periods of short supply of natural gas. FPC subsequently issued orders early in 1973 containing policy statements establishing, initially, nine priorities of end use natural gas, ranging from a top priority assigned to residential customers and commercial customers using less than 50 MCF on a peak day down to customers with interruptible requirements of more than 10,000 MCF per day, where alternate fuels available can meet those requirements. Panhandle then revised its curtailment plan effective November 1, 1973. That plan is founded upon a "base period" from May, 1969, through October, 1971, which shows the highest individual monthly deliveries. When curtailment is required on the Panhandle system, individual customers are curtailed in natural gas supply from their respective base period monthly volume as a pro rata share. This curtailment plan resulted in Gas Service filing with PSC in September, 1973, an addition to its tariff which restricted the addition of new applicants and limited existing customers to their then existing usage levels. Harrisonville was put under Gas Service's tariff restriction October 5, 1973. The tariff was subsequently revised as to expiration date to extend the restrictions to Sep-

tember 25, 1975. Meanwhile, intervenor, City of Harrisonville, filed its complaint requesting exemption from that portion of Gas Service's tariff, which had been filed and approved, entitled "Limitations Upon Company's Obligation to Supply Gas Service" upon which complaint PSC proceeded to conduct hearings, and which resulted in this further evidence:

In October, 1973, of the 554,486 MCF of gas of Panhandle's supply to Gas Service under the contract, 62,166 MCF were not taken; in November, 1973, there were 820,-595 MCF available, and 115,570 were not taken; in December, 1973 (a colder month), 30,314 MCF were not taken. From October, 1974, through September, 1975, the natural gas projected to be available to Gas Service under its Panhandle contract exceeded that actually taken by Gas Service from October, 1973, through September, 1974, by 389,298 MCF. On the ten highest peak usage days from October 1, 1973, through October 26, 1974, Gas Service was able to serve all its large industrial-commercial customers, although supplies to them had been totally curtailed by the FPC. The unused natural gas, amounting to a 13% decrease, for the foregoing periods was the result of domestic users' conservation efforts. From February, 1973, through October, 1973, excluding July, August and September, the total result was a domestic use decline of 3,925,771 MCF of which large industrial and commercial customers and power plants consumed 1,766,597 MCF. The remaining volume, 2,159,174 MCF, was lost to Gas Service's system, which has no storage facilities. The record shows that the average residential home uses 160.2 MCF *per year*. During this same period of time Gas Service requested a rate increase of PSC which was based in part upon loss of sales of natural gas, 2,160,175 MCF, as measured against Harrisonville's need of 4,790 MCF per day (which would total about 862,200 MCF for the six month period in question).

As to the impact of curtailment upon Harrisonville's economy and growth, Felix Hacker, a fourth year alderman, testified that building permits had been issued by the city: 1971, 172; 1972, 142; 1973, 142; 1974, 54, the latter figure being the result of gas restrictions being imposed. Hacker's business, a Gamble's store, suffered a 20% decline the past year, and he sold very few gas appliances. Banker William Fowler is a developer of real estate—Thunderbird Estates in the northeast part of the city, within the city limits and initially consisting of 160 acres. 46 lots were developed to late 1972, but only 5 have homes upon them. Other lots have been sold, 32 lots remaining of the original 56, but no building is being done by reason of the gas situation. Fowler had been making 40 to 45 construction loans per year, which in 1974, was reduced to 10 to 12 loans. Banker Jordan D. Lindsey had made 40 to 60 real estate construction loans for the past 6 to 8 years, but no more than 8 new starts were made since the fall of 1973. Charles A. Jones, a partner in HJM housing development project, had 26 out of 124 lots fully developed, and 15 acres of available land was unplatted. The Gas Service restrictions "killed them completely." Gas Service serves Harrisonville's electric power plant, and in December, 1970, served 1,906 other customers, which by December, 1973, had grown to 2,306 customers, an increase of 19.1%. The foregoing decline in new home construction of at least about 130 houses, would, at 160.2 MCF per year, have consumed only 19,826 MCF per annum.

In South Johnson County, Kansas, Gas Service prior to January 1, 1974, served the communities of Stanley, Stilwell, Aubry and rural Johnson County. On that date, it filed with the Kansas Corporation Commission a tariff similar to the one here in issue. Thereafter, it constructed a 3 mile distribution line to connect its lines with those supplied with the Cities Service Company's natural gas, and did not seek FPC approval for the construction of the interconnected distribution system. Gas Service then revised its tariff removing the restrictions on the Kansas area, which was approved by the Kansas Corporation Commission.

Other interconnections between Gas Service and Cities Service were shown to have

existed: In Southwest Jackson County, to serve Liberty, Blue Springs, Lake Lotawana and Lee's Summit; Dodson (at 99th and Holmes in Kansas City) to serve the metropolitan area, Belton, Grandview and Richards-Gebaur Air Force Base. There is no limitation upon the amount of natural gas furnished by Cities Service in these community areas except that there may not be a displacement of a total transfer of Panhandle's supply to Cities Service.

A Cities Service pipeline which supplies appellant is located one mile north of Harrisonville's city limits, and within one-half mile of the Panhandle line which supplies that city.

Gas Service has a plan to serve the new Raintree subdivision, north of Harrisonville on the county line, with natural gas from Cities Service, an 8″ main on one side, and a 6″ main on the other. Raintree, which will eventually have about 1,000 residences, is not under restriction as to adding customers.

■ It is without doubt true, as Gas Service says in its Point I, that its duty to render public service is not absolute, but is qualified by the intervention of circumstances beyond its control, as, for instance, a shortage of supply (citing and quoting Priest, "Principles of Public Utility Regulation", pp. 237–238). The question in this case is whether the substantial evidence before PSC shows that there was a shortage of natural gas supply which would justify Gas Service's tariff restriction on new "hookups" to Harrisonville, or whether there was no substantial shortage and the restriction would therefore not be justified.

Gas Service says the conception of "conserved" gas is unsupported as to support the addition of new customers. The argument proceeds that the reduction in sales volumes does not represent reduced usage by Gas Service's customers only in communities served with gas purchased from Panhandle, but instead represents reduced consumption by all of its customers in Missouri, 95% of whom are served with gas purchased from Cities Service. Thus, it says, the record reflects no quantification of reduced consumption by its customers served with natural gas supplied by Panhandle. The record is contrary to this assertion: For October, November and December, 1973, unused natural gas in Gas Service's supply *from Panhandle* totalled 208,050 MCF, this being the time when the restrictions on hookups in Harrisonville first came into effect. [The 208,050 MCF would have supplied 5,000 additional residences at 160.2 MCF per annum, for that period.] The natural gas projected to be available to Gas Service from Panhandle from October, 1974, through September, 1975, exceeded by 389,298 MCF the natural gas which Gas Service actually took from Panhandle from October, 1973, through September, 1974. [This excess would have supplied some 2,433 additional residences at 160.2 MCF for that year.] On the ten highest peak usage days in Gas Service's system from October 1, 1973, through October 26, 1974, Gas Service was able to serve all of its large industrial and commercial customers, including those served exclusively with Panhandle supplied gas. This was done even though during that time period supplies for such customers had been totally curtailed by the FPC. The total reduction in gas, lost to Gas Service's system, from February, 1973, through October, 1973, was 2,159,174 MCF, enough as PSC and Harrisonville say, to have served 13,500 residences. At the time of this hearing, there were some 130 lots ready for development in Harrisonville, which also at the rate of 160.2 MCF per year, would consume some 21,000 MCF out of the foregoing unused natural gas. It is demonstrated that PSC's order is replete with substantial evidence to support it in that there was sufficient available surplus natural gas in Gas Service's system to supply Harrisonville's relatively small needs.

Consideration and comment should be made of the obvious analogous relationship among Cities Service, Gas Service and Panhandle in the south Johnson County interconnected supply system accomplished at about the same time as the restrictions were placed upon Harrisonville. It is not adequately explained in the record why two

residential areas growing together in Kansas, and which were interconnected in Gas Service's system so that the two areas would be served by both Panhandle and Cities Service, are any different, in substance, than the growing Harrisonville area. In this connection, although Gas Service says that Cities Service, in a letter dated November 1, 1973, stated that it would not serve anyone else, that letter is in response to one from Gas Service requesting permission to furnish gas to *Kansas* communities. Obviously, Cities Service's expression carries little weight because it was a party to the interconnected Gas Service system in southern Johnson County, Kansas. It is further not explained why these same three companies could not agreeably make the same arrangement as to Harrisonville in interconnecting its Panhandle line to Cities Service, as exists in the Dodson area. That procedure would involve a line of some 2,600 feet, as contrasted to the three mile line constructed to serve the two Kansas residential areas. "Displacement" could thus be accomplished, and if it did not require FPC [FERC] approval in Kansas, so should it not require it for Harrisonville, especially since the record shows that Gas Service is continuing to add new residential customers to its system in both Kansas and Missouri, as supplied by both Panhandle and Cities Service, and under the same G–2 contract which Gas Service has with Panhandle. PSC's finding that "The Gas Service Company is in a position to displace some Panhandle gas in part of its system to be used in the Harrisonville area" is likewise supported by substantial evidence.

PSC found that Gas Service could furnish additional natural gas to Harrisonville by filing an application under 15 U.S.C.A. § 717f(a), to construct a city gate on the Cities Service, at a cost of approximately $14,200 for 3,450 feet of 4″ pipe, service lines, meters and right-of-way, and observed, "This application would likely be opposed by Cities Service. The company would be able even under its own estimates to make some return on this investment. The long range return would, of course, depend on a great many variables." 15

U.S.C.A. § 717f(a) provides: "Whenever the Commission, after notice and opportunity for hearing, finds such action necessary or desirable in the public interest, it may by order, direct a natural-gas company to extend or improve its transportation facilities, to establish physical connection of its transportation facilities with the facilities of, and sell natural gas to, any person or municipality engaged or legally authorized to engage in the local distribution of natural or artificial gas to the public, * * * if the Commission finds that no undue burden will be placed upon such natural-gas company thereby: *Provided*," (there shall be no authority to compel enlargement of transportation facilities, or to establish physical connections or sell natural gas when to do so would impair its ability to render adequate services to its customers). Of course, a fair reading of PSC's finding is that it is not an absolute that FPC (FERC) would find the evidence sufficient to grant a certificate of public convenience to Cities Service requiring it to extend its lines to Harrisonville. Many evidentiary factors would have to be considered such as what is in the public interest; whether an undue burden would be placed on Cities Service, and whether its ability to serve other customers would be impaired. The finding is but an alternative which Gas Service could use, and it is noted that PSC included in its findings, "However, since there are alternative methods for providing the additional gas supply, the Commission concludes that it should not by this Report and Order preclude the Gas Service Company from deciding which method or combination of methods to use in serving Harrisonville." It is reasonable to conclude that if the facts were the same before FPC (FERC) as were before PSC here, the result would be that a certificate of convenience and necessity would be issued, especially in view that additional residential customers were being hooked onto the two systems in many other areas, and none were being permitted in Harrisonville.

Gas Service cites *Re Interstate Gas Company* and *Cities Service Gas Company*, 6 FPC 252, for the proposition that Cities

Service had once sought FPC authority to serve Harrisonville, and had been refused. PSC observes that the *Interstate* case was decided in 1947, and that the refusal in part was based upon the finding that Gas Service was then adequately serving that city. Here, upon the record, Gas Service is not adequately serving Harrisonville, at least insofar as permitting new hookups, which it had been doing throughout its system and by its interconnections with Cities Service.

The trial court found and concluded that PSC's report and order disapproving Gas Service's filed tariff, and directing that a tariff be filed allowing connection of additional retail customers within Harrisonville, is "lawful, reasonable, and based upon competent and substantial evidence on the whole record." Additionally, the court found, "There is competent and substantial evidence upon the whole record upon which Respondent *could* find (italics added): D. That the availability of gas for new connections in areas adjacent to the city, while potential customers in the city were precluded by Relator's tariff from connection, was unduly discriminatory." In its intervening complaint, Harrisonville pleaded that the restrictions were discriminatory against it, but PSC made no finding or conclusion as to that allegation. The trial court's observation is beyond the record and may be disregarded inasmuch as it made the further finding that PSC's order disapproving the restrictive tariff was lawful and reasonable, and it affirmed the Report and Order.

Gas Service lastly contends that PSC erred in not finding that substantial danger to the public and Gas Service's employees would result if additional connections were required, and "in concluding" that PSC's order did not violate the company's rights under U.S.Const. Amend. IV. There was no evidence presented as to any danger, nor were the issues in any way presented to PSC. The point must be overruled.

■ Under the whole record, the Report and Order was reasonable as supported by substantial evidence, Ozark Electric Coop., supra, and it was within the jurisdiction of PSC. *Federal Power Commission v. Transcontinental Gas Pipe Line Corp.*, 365 U.S. 1, 81 S.Ct. 435, 445[7, 8], 5 L.Ed.2d 377 (1961).

The judgment is affirmed.

All concur.