The STATE of Missouri, ex rel. PHILIPP TRANSFER LINES, INC., and Philipp Transit Lines, Inc., Relators-Appellants,

v.

The PUBLIC SERVICE COMMISSION of the State of Missouri, Respondent-Respondent,

and

Churchill Truck Lines, Inc., Dodds Truck Lines, Inc., Garrison Motor Freight, Inc., Frisco Transportation Company, Anderson Motor Service, Inc., Middlewest Freighways, Inc., Lovelace Truck Service, Inc., Sanders Truck Line, Inc., Niedergerke Truck Line, Inc., Orscheln Bros. Truck Lines, Inc., Burggrabe Truck Line, Inc., Creech Bros. Truck Line, Inc., Inman Freight System, Inc., Main Line Hauling Co., Inc., Intervening Respondents-Respondents.

No. KCD 30576.

Missouri Court of Appeals, Western District.

May 5, 1980.

Tom B. Kretsinger, Liberty, for relators-appellants.

Paul W. Phillips, Jefferson City, for respondent-respondent.

John E. Burruss, Jr., Jefferson City, for intervening respondents-respondents.

Before CLARK, P. J., and DIXON and SOMERVILLE, JJ.

CLARK, Presiding Judge.

This case originated when Philipp Transfer Lines, Inc., hereafter "Transfer," and Philipp Transit Lines, Inc., hereafter "Transit," both motor freight common carriers, filed a supplement to the Middlewest Motor Freight Bureau Tariff. Under the tariff supplement, Transfer and Transit, in various combinations of their certificated routes, offered through service at joint rates to and from numerous points of origin and destination throughout Missouri. The Missouri Public Service Commission, hereafter "Commission," ordered the tariff suspended pending publication of notice and a hearing.

In response to the notice of hearing, a number of motor freight carriers who were or would be in competition with Transfer and Transit in areas affected by the tariff intervened as opponents. Eleven of such carriers have participated throughout the progress of the case. They appear here and have filed briefs as intervening respondents. The decision of the Commission, rendered after hearing, ordered Transfer and Transit to cancel the tariff and to cease and desist from the joint transport of freight along the routes and at the rates published in the suspended tariff. Transfer and Transit appealed the Commission decision to the Circuit Court of Cole County, which affirmed the Commission, and they now seek further review of that result here. We affirm.

A grasp of the issues posed in the case requires exposition of terms and procedures peculiar to the regulation of carriers who transport freight by motor trucks on the highways of the state.

Supervision of motor freight carriers by the Commission is, initially, through control over certificates of public convenience and necessity without which no truck line may operate on the highways as a common carri-

er. § 390.051.[1] Upon approval by the Commission, a certificate issued to a truck line conveys authority for the transport of goods either as a regular route carrier or an irregular route carrier. In general, regular routes as designated in a certificate are described by terminal and intermediate points along a specific course of travel. § 390.020(15). Irregular routes are described by the identification of a base area, usually shown as a radius from a fixed point, and without advance specification of any particular destination terminal. § 390.-020(8). In that selection of destinations and routes of travel, however, irregular route carriers are prohibited from transporting freight between points on the route of any regular route carrier. § 390.051(8).

Regular route carriers are protected from general competition by other truck lines because of the prohibition against duplication of service by any irregular route carrier and the exclusion of other regular route carriers from the same route except those carriers which have received a certificate of public convenience and necessity for that particular route from the Commission. In return for the protected franchise, a regular route carrier must operate on established schedules regardless of the quantity of freight tendered for carriage. Irregular route carriers, by contrast, operate on call and demand, which signifies that they have no established schedules but move only to destinations of choice when sufficient freight is offered to justify the carriage.[2]

Under the practice in the motor freight industry, a tariff is the term which describes a publication of services offered by a motor freight carrier. The tariff will list points of origin and destination served by that carrier, other points served in combination with other carriers, the commodities and goods accepted for transport and the rates charged.

■ As among regular route carriers, through routes and joint rates may be established by a practice known as interlining. Under this concept, two or more carriers transfer shipments at points of joint service, that is, points where the certificated regular routes meet, thus enabling the initiating carrier to offer destination service to shippers who wish goods transported beyond the terminus of that carrier's regular route. Regular route carriers have the right to establish through routes and joint rates over routes for which the respective carriers already hold certificates and may do so without specific approval by the Commission. *State ex rel. Philipp Transit Lines, Inc., et al. v. Public Service Commission*, 523 S.W.2d 353 (Mo.App.1975).

Turning now to the suspended tariff of Transfer and Transit, the present controversy centers on through routes and joint rates resulting from interchange of freight between these two carriers, providing a service beyond that which each carrier alone could offer by utilizing only its own certificated routes. Such service is described through the medium of the tariff published by Transfer and Transit and suspended by order of the Commission.

Transfer and Transit as common carriers of motor freight hold a number of certificates of public convenience and necessity issued to them by the Commission authorizing service other both regular and irregular routes. In the subject tariff, these two carriers proposed to interline freight at points of common service—Marthasville or Washington, Missouri, and, through joint rates, each carrier will offer shippers through service to points beyond those served by the carrier upon its certificated routes alone. In contrast to the joint routes and through rates between regular route carriers approved in *State ex rel. Philipp, supra*, the subject case involves combinations of two irregular routes, or, of an irregular with a regular route, to accomplish

---

1. All statutory citations are to *RSMo 1969*, applicable here because the date of hearing before the Commission was April 12, 1976.

2. An extensive discussion of service characteristics and route authority distinguishing regular route carriers from irregular route carriers will be found at *In the Matter of Ben Gutman Truck Service, Inc.*, 20 Mo.P.S.C. at 200 (1933).

an interline joint carriage from origin to destination.

The Commission, under the authority of § 390.041(3), has established rules and regulations to be observed by motor freight carriers. Among these is Commission Rule 35 to General Order 33–F published at 4 CSR 240–110.050(2), hereafter "Rule 35." In substance, Rule 35 provides that establishment of joint service at through rates is limited to carriers authorized to provide service on regular routes. Thus, the tariff of Transfer and Transit is in violation of Rule 35 because the through routes there described include combinations of irregular routes.

Rule 35 is an expression of interpretation and application by the Commission of § 390.116, the pertinent portion of which states:

> "Common carriers of property may establish reasonable through routes and joint rates, charges and classifications with other such carriers or with common carriers by railroad or express * * * "

The term "common carrier" means any person, firm or corporation which holds itself out to the general public as providing the service of transporting persons or property for hire by motor vehicle on the public highways. § 390.020(5). Common carriers are distinguished from contract carriers in that the latter do not serve the general public and operate under different provisions of Commission regulation. As employed in § 390.116, the term "common carriers" does not distinguish between regular and irregular route carriers.

In support of Rule 35 and the interpretation of § 390.116, the Commission contends that the word "routes" used in the phrase "through routes" is limited to the routes of regular carriers because only in this classification are points of origin and destination specified in the certificate, thereby creating routes. They argue that an irregular carrier, to the contrary, does not possess "route" authority in the strict sense because the certificate of public convenience and necessity authorizes area service, i. e., from a base area to any point in the state which the shipper selects along courses of travel which depend from trip to trip on the destination of the consignment. The Commission suggests that participation in interlining must of necessity entail advance designation of a point where interchange will occur and, as to an irregular carrier, this results in the creation by the joint tariff of a regular route in contravention of exclusive Commission authority on the subject.

The language of § 390.116 and the arguments fielded by the respective parties here indicate that at least some doubt may exist as to what combinations of certificated routes may be made by motor freight carriers without Commission approval. In such a circumstance, the Commission observes that its interpretation, exemplified by Rule 35, has controlled joint service tariffs since 1951 and the rule has apparently been accepted by the industry without challenge prior to the subject case.[3] The Commission suggests that the legal construction and administrative interpretation placed upon a statute which is vague, indefinite or ambiguous carries great persuasive influence where the agency charged with executing the statute has adopted a particular meaning and has followed it for some time. Among other cases supporting this proposition, *State ex rel. Jackson County v. Public Service Commission*, 532 S.W.2d 20 (Mo. banc 1975), is cited.

Intervenors, the competing motor carriers, join in the arguments advanced by the Commission, and also contend that the proposed interlining will permit Transfer and Transit to compete with regular route carriers by duplicating regular route service and yet enjoy the advantage of call and demand service characteristic of irregular route certification. This, they say, will divert shipments from the regular carriers to their economic loss and will undermine the concept of dependable service available to the

---

3. *State ex rel. Philipp, supra*, in fact challenged rule 35, but on the limited ground of joint tariffs by regular carriers over regular routes.

public on schedules which assure motor freight transport on regular routes. Additionally, it is argued that the net consequence would be a proliferation of routes for which no necessity has been demonstrated.

The argument advanced by Transfer and Transit in support of their tariffs concentrates again on the disputed interpretation of § 390.116. They contend that establishment of through routes and joint rates by interlining enjoys statutory approbation without hindrance by the Commission and that the statutory reference to "common carriers" conveys no distinction between regular and irregular route carriers. Noting the partial emasculation of Rule 35 by the decision in *State ex rel. Philipp, supra,* Transfer and Transit suggest that the same rationale as expressed in that case should be applied to validate their tariffs and to reject Commission enforcement of Rule 35, at least on the question of combining irregular routes to provide through service.

Transfer and Transit also cite the practice of the Interstate Commerce Commission when administering federal regulation of interstate operations by motor carriers. There, cases noted [4] confirm a uniform policy of permitting joint service regardless of whether the combination is of regular or irregular routes, as long as the certificates contain no express restrictions to the contrary.

The challenge which Transfer and Transit make here as to Rule 35 and the order suspending the disputed tariffs does not question either the authority of the Commission to adopt rules and regulations or to supervise generally the tariffs of motor freight carriers. That such regulatory activity by the Commission is an appropriate function is beyond question. § 390.041. Indeed, the Commission has been described as an agency of the legislature to which both express and implied powers have been delegated as necessary to give full effect to the legislation enacted. *State v. Public Service*

*Commission,* 232 Mo.App. 755, 111 S.W.2d 982 (1937).

The thrust of Transfer and Transit's contention is that the Commission order suspending their tariffs is unlawful because, as common carriers with certificates of convenience and necessity, they possess a statutory right to publish a schedule of services on joint routes and Rule 35 is therefore in excess of the Commission's express or implied power to regulate the industry.

■ Of course, the lawfulness of orders issued or actions taken by the Commission depends primarily on whether the Commission had statutory power and authority to act. *Maag v. Public Service Commission,* 384 S.W.2d 801 (Mo.App.1964). Ascertainment of the presence or absence of statutory authority undergirding Rule 35 and the consequent suspension of the subject tariffs depends upon interpretation of § 390.116, the subject principally addressed by the parties here in argument and briefs, but also entails consideration of the comprehensive statutory scheme for regulation of motor carriers and the impact of the issue generally. Because the problem involves construction of the statutes and application of the law, deference is not to be considered as weighing the balance in favor of the prior decision by the administrative agency, but the court is entitled to reach its own conclusion. *Gilmore v. Thompson,* 413 S.W.2d 20, 22 (Mo.App.1967).

The general concept of motor freight carrier regulation embodied in Chapter 390 rests upon a restriction of service facilities to that number of carriers and those modes of service demonstrated to be required by public need and convenience. In the route certification process, the Commission permits or denies entry into the market and, if entry is granted, the Commission further prescribes the type of service a carrier may render, again because there is an apparent public need.

**4.** *Jack Cole Co., Inc. Common Carrier Application* 41 M.C.C. 657 (1943); *W. M. Daniels,* 43 M.C.C. 726 (1943); *Portland Van and Storage*  *Co., Inc., Extension-California,* 34 M.C.C. 420 (1942); *Lubbock-El Paso Motor Frt., Inc. Com. Car. App.,* 27 M.C.C. 585 (1941).

In the case of regular route carriers, the service they have been authorized to provide between or among specific termini over fixed routes resulted from proof to the Commission that a public need existed for such service. The certificate for an irregular carrier is similarly grounded on a demonstrated public need, but of an entirely different composition.

The irregular carrier moves freight from a base area where shippers have been shown to require non-scheduled service in quantity to varying destinations. While the regular carrier operates along a fixed route, usually with terminals at either extreme, and will anticipate both outgoing and incoming freight at its various terminals and intermediate points, the irregular carrier depends on its base area to generate business with little if any prospect that freight will be carried on return. The public need shown for irregular carrier service thus focuses on a base area where a significant volume of shipping in quantity originates, while the public need for regular carrier service encompasses transport of freight on a reciprocal pattern among fixed points on regular schedules.

If, as proposed in the tariff of Transfer and Transit, the joint transport includes the irregular routes of each, the result is the immediate transformation of the route structure from that for which a public need was originally shown. Combination of Transfer and Transit irregular routes connects the base areas of each to form a route with defined points of origin and destination, a characteristic incompatible with the concept of irregular routes and foreign to the factual basis of public convenience and necessity which prompted issuance of the original certificates. Similarly, the interchange of freight between regular and irregular routes permits the regular route carrier to reach points of destination in the state for which it has shown no public need and effectively extends the regular carrier's route without the control of Commission certification.

The Commission arguments previously noted which support the validity of Rule 35 and its application to the tariffs in this case are persuasive and are consistent with the foregoing analysis of the statutory scheme for regulation of motor freight carriers. To the contrary, the construction which Transfer and Transit would adopt as to § 390.116 would imply legislative intent that this section be operative as authority for carriers, by the expedient of joining routes, to convey freight to and from places other than those for which public convenience and necessity requires such service.

Superficially, it may be argued that *State ex rel. Philipp, supra,* reached a result consistent with the position taken here by Transfer and Transit, but the fundamental difference between regular and irregular certified routes adequately distinguishes the cases. The basis for the decision in *State ex rel. Philipp* was, as there noted, that by combining regular routes, the carriers were not serving any points and were traveling no other routes than those which the Commission had previously determined to require the service and had so certified. The nature of irregular routes, which by definition are not limited to previously established pathways or destinations, precludes any inherent control in what routes may evolve when combinations such as those proposed by Transfer and Transit are accepted. It therefore may not be said that such generation of routes is confined to the limits of prior certificates.

Further basis exists to reject the contention of Transfer and Transit that the proposed joint routes and through rates have statutory sanction. § 390.051(8) directly bears on the problem at hand and reinforces the conclusion that interlining with irregular routes exceeds the regulatory scheme of the statutes. That section reads:

"It shall be unlawful for any common carrier, except one having a certificate authorizing such service, to accept persons or property for transportation between points on the route of a regular route common carrier or between points on the routes of two or more regular route common carriers where through or joint service has been authorized or es-

tablished between such regular route common carriers."

The import of § 390.051(8) is to exclude irregular route carriers from the transport of goods between points served by regular route carriers, thus granting to the regular carriers so certified the exclusive entitlement to that segment of the freight business. From argument and briefs here, Transfer and Transit do not contend that existing irregular route authority of either now permits them to engage in competition with regular route carriers as to points served by regular carriers. The proposed tariffs of Transfer and Transit must, however, by the nature of irregular route certification, accomplish the same intercession in existing regular routes and permit Transfer and Transit in combination to do that which neither is authorized to do alone.

■ In sum, the statutes mandate and the Commission has correctly required that points on regular routes can only be served by regular route carriers holding certificates for such routes. The regular route carriers are protected from competition as to such points of service by irregular route carriers individually, in combination with each other or in combination with regular route carriers. Such rules are essential to the authority of the Commission to control service in the public interest. § 390.041.

■ The argument by Transfer and Transit that federal decisions construing and applying the Interstate Commerce Act to permit interlining between irregular and regular routes should be persuasively employed here is unsound. No provision comparable to § 390.051(8) is to be found in the Interstate Commerce Act. The decisions cited by Transfer and Transit and others noted herein, *supra,* while informative on interstate regulation of motor freight traffic, are of little value in construing Missouri statutes regulating intrastate operations under different provisions.

The parties have cited no Missouri authority in point as respects the limited subject here addressed—the combination of irregular routes and of irregular and regular routes to provide through routes and joint rates, and independent research has disclosed none. A similar question involving a combination of an irregular and a regular route was, however, considered in *E. A. Schlairet Transfer Co. v. Public Utilities Commission,* 174 Ohio St. 554, 190 N.E.2d 910 (1963). There, the Supreme Court of Ohio adopted and quoted with approval from the opinion of the Ohio Public Utilities Commission denying a joint rate tariff filed as to irregular and regular routes of the respective carriers. The observations as to the effect of the proposed tariff, which are equally applicable here, included the following:

"In the view of the commission, the proposals here made, if allowed to go into effect, would completely disrupt the system of regulation which has been functioning for many years, and under which the motor carriers of this state have developed their service and facilities in competitive balance. Therefore, the commission concludes that whether predicated on the clear sense of the statutes, as they necessarily operate in practice or whether predicated on Section 4921.03 of the Revised Code [5] which directs the commission to foster sound policies in transportation in general terms, the joint rates here proposed should not be permitted to go into effect."

■ In this opinion, specific mention has not been made of points which Transfer and Transit propose to serve under the suspended tariffs, the number of which points, together with accompanying rates and lists of

---

5. § 4921.03, Ohio Revised Code, announces the general policy to be observed by the Public Utilities Commission of Ohio and instructs that motor freight carriers are to be regulated "in such manner as to recognize and preserve the inherent advantages of, and foster sound economic conditions in, such transportation and among such carriers in the public interest."

§ 390.041, RSMo 1969, vests in the Public Service Commission of Missouri power and authority generally to regulate every motor carrier in the state in all matters affecting their relationship with the public "as the commission deems necessary or desirable in the public interest."

commodities, is extensive. It is therefore necessary to stress the limitations of this decision. As to common points of service where the routes of regular route carriers meet or intersect, tariffs are not prohibited where the exchange of freight results in a total carriage over regular routes. Such interlining is, under *State ex rel. Philipp, supra*, a right incident to certification of regular routes. This opinion treats only of through routes and joint rates scheduled by combinations of irregular routes, or by combination of an irregular route with a regular route. The Commission has validly acted to prohibit such tariffs and the circuit court properly affirmed the Commission order.

The judgment of the circuit court is affirmed.

All concur.